[878 NE2d 969, 848 NYS2d 554]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN TAYLOR, Appellant.

Argued September 10, 2007; decided October 23, 2007

**POINTS OF COUNSEL**

*Kevin M. Doyle, Capital Defender,* New York City (*Susan H. Salomon* and *Barry J. Fisher* of counsel), for appellant. I. *People v LaValle* (3 NY3d 88 [2004]) requires voiding John Taylor's death sentences. (*People v Favor,* 82 NY2d 254; *People v Mitchell,* 80 NY2d 519; *People v Pepper,* 53 NY2d 213; *People v Hobson,* 39 NY2d 479; *Payne v Tennessee,* 501 US 808; *Arizona v Rumsey,* 467 US 203; *Semanchuck v Fifth Ave. & 37th St. Corp.,* 290 NY 412; *People v Bing,* 76 NY2d 331; *People v Damiano,* 87 NY2d 477; *Grace Plaza of Great Neck v Elbaum,* 82 NY2d 10.) II. Since the death penalty no longer functions in this state, John Taylor's execution would not measurably further any goals of punishment; it would therefore constitute cruel and unusual punishment and violate, as well, this State's common-law principles granting offenders the benefits of ameliorated punishment. (*People v LaValle,* 3 NY3d 88; *Pulley v Harris,* 465 US 37; *Furman v Georgia,* 408 US 238; *Gregg v Georgia,* 428 US 153; *Coker v Georgia,* 433 US 584; *Enmund v Florida,* 458 US 782; *Walton v Arizona,* 497 US 639; *McCleskey v Kemp,* 481 US 279; *Thompson v Oklahoma,* 487 US 815; *People v Hooks,* 96 AD2d 1001.) III. Under New York's Constitution, the death penalty constitutes cruel and unusual punishment and, without compelling state interest, deprives citizens of the fundamental right to life and, thereby, of due process and equal protection. (*People v P.J. Video,* 68 NY2d 296; *Gregg v Georgia,* 428 US 153; *Furman v Georgia,* 408 US 238; *People v Fitzpatrick,* 32 NY2d 499; *Woodson v North Carolina,* 428 US 280; *People v Smith,* 63 NY2d 41; *Atkins v Virginia,* 536 US 304; *People v LaValle,* 3 NY3d 88; *Roper v Simmons,* 543 US 551; *People v Isaacson,* 44 NY2d 511.) IV. Four of John Taylor's six convictions for first-degree murder—those for commanding Craig Godineaux to kill three victims and for killing Anita Smith himself—were against the weight of the evidence, and the command convictions were not even supported by legally sufficient evidence. (*People v Mateo,* 2 NY3d 383; *People v Couser,* 258 AD2d 74, 94 NY2d 631; *People v*

*Rayam,* 94 NY2d 557; *People v Cahill,* 2 NY3d 14; *People v Ryan,* 82 NY2d 497; *Jackson v Virginia,* 443 US 307; *People v Higgins,* 5 NY2d 607; *People v Crum,* 272 NY 348; *People v Davis,* 43 NY2d 17; *People v Blim,* 63 NY2d 718.) V. Police and prosecutors interrogated John Taylor even after his counsel in a pending robbery case informed them that her representation covered any new arrest, including the Wendy's matter, and that he should not be questioned. Because Taylor's right to counsel thereby indelibly attached and a later "waiver" of counsel was obtained outside his lawyer's presence, his subsequent confessions were wrongly admitted. (*People v Lennon,* 243 AD2d 495, 91 NY2d 942; *Moran v Burbine,* 475 US 412; *People v West,* 81 NY2d 370; *People v Donovan,* 13 NY2d 148; *People v Garofolo,* 46 NY2d 592; *People v Pinzon,* 44 NY2d 458; *People v Gunner,* 15 NY2d 226; *People v Failla,* 14 NY2d 178; *People v Schaeffer,* 56 NY2d 448; *People v Byrne,* 47 NY2d 117.) VI. Over repeated defense objections and mistrial motions, the court let a prosecution psychologist testify extensively about accomplice Craig Godineaux's difficult childhood and cognitive impairments. This evidence was irrelevant to determining John Taylor's conduct or mental state, and a back door to unconfronted hearsay from Godineaux and his relatives. But the prosecutor used it to cast Godineaux as pathetic and comparatively blameless, and to assign the culpability for the killings—including "command" responsibility—to Taylor. (*Crawford v Washington,* 541 US 36; *People v Goldstein,* 6 NY3d 119; *People v Couser,* 94 NY2d 631; *People v Cratsley,* 86 NY2d 81; *Atkins v Virginia,* 536 US 304; *People v Sandoval,* 34 NY2d 371; *People v Miller,* 39 NY2d 543; *People v Marx,* 305 AD2d 726; *People v Freshley,* 87 AD2d 104; *People v Primo,* 96 NY2d 351.) VII. After convicting Craig Godineaux of murder for intending in advance to kill all the Wendy's victims, the prosecution argued the opposite at John Taylor's trial: that Godineaux had no intent to hurt anyone until Taylor killed two victims and told him to shoot the rest. Because the prosecution employed its contradictory theory both to argue that Godineaux must have acted at Taylor's "command" and to heighten Taylor's relative culpability at the sentencing hearing, this unethical tactic violated due process, requiring reversal of the command convictions and death sentences. (*People v Edwards,* 274 AD2d 754; *People v Cabey,* 85 NY2d 417; *People v La Belle,* 18 NY2d 405; *People v Torres,* 153 AD2d 911; *People v Godineaux,* 2 AD3d 875; *People v Couser,* 94 NY2d 631; *People v Santorelli,* 95 NY2d 412; *Drake v Kemp,* 762 F2d 1449; *Smith v Groose,* 205 F3d 1045; *Thompson v Calderon,* 120 F3d 1045.)

VIII. In sentencing summation, the prosecutor falsely insinuated that John Taylor's past involved convictions for crimes of violence. The court had licensed this misconduct when it improperly refused to submit the mitigating factor that Taylor had no history of convictions involving the use of violence, relegating the defense instead to qualifying the mitigator, undeservedly, as one of no "significant" history. (*People ex rel. Harris v Sullivan,* 74 NY2d 305; *People v Duggins,* 3 NY3d 522; *People v Blair,* 90 NY2d 1003; *People v Carborano,* 301 NY 39.) IX. The court permitted the prosecution to impugn, as manipulative and tantamount to child abuse, John Taylor's presentation of his children as mitigation witnesses—and then compounded the harm by warning the jury that it was not to consider the pain or sadness the children might feel if Taylor were executed. (*Marshall v Hendricks,* 307 F3d 36; *Burns v Gammon,* 260 F3d 892; *Penry v Lynaugh,* 492 US 302; *Washington v Texas,* 388 US 14; *People v Manganaro,* 218 NY 9; *People v Robinson,* 260 AD2d 508; *People v Diaz,* 170 AD2d 202, 172 AD2d 341; *People v Collins,* 140 AD2d 186; *People v Calabria,* 94 NY2d 519; *People v Skinner,* 298 AD2d 625.) X. Unchecked by the court, the prosecution impermissibly cast sentencing as a contest between the victims and defendant, centered on their comparative worth and rights. (*People v Harris,* 98 NY2d 452; *People v Miller,* 6 NY2d 152; *People v Caruso,* 246 NY 437; *People v LaValle,* 3 NY3d 88; *People v Mleczko,* 298 NY 153; *People v Peller,* 291 NY 438; *People v Blair,* 90 NY2d 1003; *Payne v Tennessee,* 501 US 808; *Humphries v Ozmint,* 397 F3d 206; *People v Manganaro,* 218 NY 9.) XI. The trial court violated John Taylor's nonwaivable right to a jury of 12 when it substituted an alternate juror for a regular juror after penalty-phase opening arguments. (*People v Cosmo,* 205 NY 91; *People v Page,* 88 NY2d 1; *People v Ryan,* 19 NY2d 100; *People v Cahill,* 2 NY3d 14; *Cancemi v People,* 18 NY 128.) XII. The court wrongly refused to consider John Taylor's unchallenged claim that New York's lethal-injection procedures create a substantial risk of prolonged and torturous executions and thus constitute cruel and unusual punishment. (*Campbell v Wood,* 18 F3d 662; *Gregg v Georgia,* 428 US 153; *Oken v Sizer,* 321 F Supp 2d 658; *Beardslee v Woodford,* 395 F3d 1064; *Brown v Crawford,* 408 F3d 1027, 544 US 1046; *Morales v Hickman,* 415 F Supp 2d 1037, 438 F3d 926; *Fierro v Gomez,* 77 F3d 301; *Weems v United States,* 217 US 349.)

*Richard A. Brown, District Attorney,* Kew Gardens (*Gary S. Fidel, John M. Castellano* and *Donna Aldea* of counsel), and

*New York Prosecutors Training Institute (Susan L. Valle, Debra Whitson* and *Robert J. Conflitti* of counsel), for respondent. I. The deadlock instruction is neither unconstitutional on its face nor as applied to this case. (*People v LaValle,* 3 NY3d 88; *Brady v State of New York,* 80 NY2d 596; *People v Bright,* 71 NY2d 376; *People v Nebbia,* 262 NY 259; *People ex rel. Henderson v Board of Supervisors of County of Westchester,* 147 NY 1; *People v Stuart,* 100 NY2d 412; *Ulster Home Care v Vacco,* 96 NY2d 505; *People v Nelson,* 69 NY2d 302; *National Endowment for Arts v Finley,* 524 US 569; *Hoffman Estates v Flipside, Hoffman Estates, Inc.,* 455 US 489.) II. Defendant does not have standing to challenge New York's death penalty statute on grounds inapplicable to his case; but in any event, the statute must be upheld under the State and Federal Constitutions. (*People v Broadie,* 37 NY2d 100, 423 US 950; *Gregg v Georgia,* 428 US 153; *People v Hale,* 173 Misc 2d 140, *revd on other grounds sub nom. Matter of Hynes v Tomei,* 237 AD2d 52, 92 NY2d 613, 527 US 1015; *People v Kemmler,* 119 NY 580; *People v Davis,* 43 NY2d 17; *People v Scalza,* 76 NY2d 604; *People v Bright,* 71 NY2d 376; *People v Stuart,* 100 NY2d 412; *Cohen v State of New York,* 94 NY2d 1; *McGowan v Burstein,* 71 NY2d 729.) III. Defendant was properly found guilty of first-degree murder. The jury's sentencing determination was proper in light of the nature and circumstances of defendant's crimes. (*People v Cahill,* 2 NY3d 14; *People v Bleakley,* 69 NY2d 490; *People v Cabey,* 85 NY2d 417; *People v Davis,* 43 NY2d 17; *People v Crum,* 272 NY 348; *People ex rel. MacCracken v Miller,* 291 NY 55; *Tibbs v Florida,* 457 US 31; *People v Mateo,* 2 NY3d 383.) IV. The court below properly denied suppression of defendant's statements because the right to counsel did not attach as a result of the unilateral efforts of an attorney whose representation defendant spontaneously and unequivocally rejected at the first available opportunity. (*People v West,* 81 NY2d 370; *People v Bing,* 76 NY2d 331; *Faretta v California,* 422 US 806; *People v Coates,* 74 NY2d 244; *People v LaClere,* 76 NY2d 670; *People v Wilson,* 89 NY2d 754; *People v Garofolo,* 46 NY2d 592; *People v Gunner,* 15 NY2d 226; *People v Marrero,* 51 NY2d 56; *People v Lennon,* 243 AD2d 495.) V. The trial court properly admitted the testimony of Dr. Martell, and defendant waived any Confrontation Clause challenge to the out-of-court statements that were part of the basis of the expert's opinion. (*Price v New York City Hous. Auth.,* 92 NY2d 553; *People v Cronin,* 60 NY2d 430; *People v Lee,* 96 NY2d 157; *People v Wilder,* 93 NY2d 352; *People v Scarola,* 71 NY2d 769; *People v Davis,* 43 NY2d 17; *People v Yazum,* 13

NY2d 302; *People v Mateo,* 2 NY3d 383; *People v Rojas,* 97 NY2d 32; *People v Rivera,* 96 NY2d 749.) VI. The prosecutor's guilt-phase argument at defendant's trial did not contradict the codefendant's plea allocution with respect to the overall theory of the prosecution. (*People v Santos,* 86 NY2d 869; *People v Medina,* 53 NY2d 951; *People v Kelly,* 5 NY3d 116; *People v Yong Yun Lee,* 92 NY2d 987; *People v Ahmed,* 66 NY2d 307; *People v Jackson,* 196 NY 357; *People v Udzinski,* 146 AD2d 245; *Wainwright v Sykes,* 433 US 72; *People v Harris,* 98 NY2d 452; *People v Emieleta,* 238 NY 158.) VII. Defendant's four claims of guilt-phase error, pertaining to the command counts on which the jury did not sentence defendant to death, have no bearing on the death sentence. (*Blystone v Pennsylvania,* 494 US 299; *Boyde v California,* 494 US 370; *People v Harris,* 177 Misc 2d 378; *Brown v Sanders,* 546 US 212; *Stringer v Black,* 503 US 222; *Flamer v Delaware,* 68 F3d 736; *Williams v Calderon,* 52 F3d 1465; *Hamilton v Mullin,* 436 F3d 1181; *Chapman v California,* 386 US 18; *People v Crimmins,* 36 NY2d 230.) VIII. The prosecutor's penalty-phase summation and the court's penalty-phase instructions were both proper. (*People v Ashwal,* 39 NY2d 105; *People v Marks,* 6 NY2d 67; *People v Halm,* 81 NY2d 819; *People v Galloway,* 54 NY2d 396; *People v Brosnan,* 32 NY2d 254; *Darden v Wainwright,* 477 US 168; *People v Harris,* 98 NY2d 452; *People v Crimmins,* 36 NY2d 230; *People v Romero,* 7 NY3d 911.) IX. The trial court's substitution of an alternate juror, upon defendant's request, after guilt phase deliberations had been completed and prior to deliberations concerning sentencing was proper. (*People v Ahmed,* 66 NY2d 307; *People v Patterson,* 39 NY2d 288; *People v Webb,* 78 NY2d 335; *People v Carvajal,* 6 NY3d 305; *Cancemi v People,* 18 NY 128; *People v Cosmo,* 205 NY 91; *People v Tarsia,* 50 NY2d 1; *United States v Spero,* 331 F3d 57; *People v Dekle,* 56 NY2d 835; *People v Degondea,* 3 AD3d 148.) X. The trial court correctly rejected defendant's challenge to lethal injection procedures because the challenge is not ripe. Further, this Court lacks jurisdiction to consider the challenge, and defendant has not brought an essential party before the Court. (*People v Nieves,* 2 NY3d 310; *People v Stevens,* 91 NY2d 270; *Matter of Hynes v Karassik,* 47 NY2d 659; *People v Hernandez,* 93 NY2d 261; *Church of St. Paul & St. Andrew v Barwick,* 67 NY2d 510, 479 US 985; *Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo,* 64 NY2d 233; *Matter of Gordon v Rush,* 100 NY2d 236; *New York Pub. Interest Research Group v Carey,* 42 NY2d 527; *People v Arroyo,* 178 Misc 2d 653; *Cuomo v Long Is. Light. Co.,* 71 NY2d 349.)

*Stephen Greenwald,* New York City, for Association of the Bar of the City of New York, amicus curiae. I. The strict scrutiny standard applies to New York substantive due process claims involving the death penalty. (*Town of Orangetown v Magee,* 88 NY2d 41; *City of Amsterdam v Helsby,* 37 NY2d 19; *Mark G. v Sabol,* 93 NY2d 710; *People v Koertge,* 182 Misc 2d 183; *Furman v Georgia,* 408 US 238; *People v Adams,* 53 NY2d 241; *People v P.J. Video,* 68 NY2d 296; *People v Alvarez,* 70 NY2d 375; *People v Scott,* 79 NY2d 474; *Cooper v Morin,* 49 NY2d 69.) II. New York's death penalty statute does not pass the strict scrutiny test, and therefore it violates the Due Process Clause. (*People v Smith,* 63 NY2d 41; *People v Fitzpatrick,* 32 NY2d 499; *People v Davis,* 43 NY2d 17; *People v Oliver,* 1 NY2d 152; *People v Hale,* 173 Misc 2d 140; *Matter of Westchester County Med. Ctr. [O'Connor],* 72 NY2d 517; *Furman v Georgia,* 408 US 238; *Sumner v Shuman,* 483 US 66.) III. Other states, international communities and other sources show that New York's death penalty fails the least restrictive means test and violates due process. (*People v LaValle,* 3 NY3d 88.)

*Theodore M. Shaw,* New York City, *Jacqueline A. Berrien, Deborah Fins, Miriam Gohara* and *Christina Swarns* for NAACP Legal Defense and Educational Fund, Inc. and others, amici curiae. I. Racial bias persists. (*People v Cahill,* 2 NY3d 14; *McCleskey v Kemp,* 481 US 279; *Buckhannon Board & Care Home, Inc. v West Virginia Dept. of Health & Human Resources,* 532 US 598; *Burlington Industries, Inc. v Ellerth,* 524 US 742; *National Railroad Passenger Corporation v Morgan,* 536 US 101; *Proud v Stone,* 945 F2d 796; *Georgia v McCollum,* 505 US 42.) II. The life or death sentencing decision is especially vulnerable to the influence of racial bias. (*Walton v Arizona,* 497 US 639; *Turner v Murray,* 476 US 28; *Zant v Stephens,* 462 US 862; *People v Cahill,* 2 NY3d 14; *Wainwright v Witt,* 469 US 412; *Miller-El v Dretke,* 545 US 231; *People v Harris,* 98 NY2d 452.) III. The Court should not reinstate the death penalty, given the risk of racial bias in death sentencing and the harm it creates. (*Beck v Alabama,* 447 US 625; *People v LaValle,* 3 NY3d 88; *McCleskey v Kemp,* 481 US 279; *Swain v Alabama,* 380 US 202; *Miller-El v Dretke,* 545 US 231; *People v Harris,* 98 NY2d 452; *J. E. B. v Alabama ex rel. T. B.,* 511 US 127; *Edmonson v Leesville Concrete Co.,* 500 US 614; *Powers v Ohio,* 499 US 400.)

*Catherine Abate,* New York City, for New Jersey Crime Victims' Law Center, amicus curiae. The experience of New Jersey's victims leads inexorably to the conclusion that life

without parole is preferable to the death penalty as the sanction for first-degree murder. (*People v LaValle,* 3 NY3d 88; *People v Cahill,* 2 NY3d 14.)

*Tobin and Dempf LLP,* Albany (*Michael L. Costello* of counsel), for New York Religious Leaders Against the Death Penalty and others, amici curiae. I. The views of the religious community are relevant. (*Weems v United States,* 217 US 349; *Trop v Dulles,* 356 US 86; *Atkins v Virginia,* 536 US 304; *People v Broadie,* 37 NY2d 100; *People v Smith,* 63 NY2d 41; *California v Brown,* 479 US 538; *Penry v Lynaugh,* 492 US 302; *Bowen v Kendrick,* 487 US 589; *Stanford v Kentucky,* 492 US 361; *Ford v Wainwright,* 477 US 399.) II. The death penalty constitutes cruel and unusual punishment under New York's Constitution. (*People v Barber,* 289 NY 378; *People v Alvarez,* 70 NY2d 375; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553; *People v Scott,* 79 NY2d 474; *People v P.J. Video,* 68 NY2d 296.) III. Capital punishment violates human dignity and contemporary standards of decency.

*Connors & Vilardo, LLP,* Buffalo (*Terrence M. Connors, Vincent E. Doyle III* and *Jennifer R. Scharf* of counsel); *Harrington & Mahoney* (*James P. Harrington* and *Mark J. Mahoney* of counsel); *Hodgson Russ LLP* (*Joseph V. Sedita* of counsel); *David Gerald Jay; Personius Melber, LLP* (*Rodney O. Personius* of counsel); *Rosenthal, Siegel, Muenkel & Meyers, LLP* (*Cheryl Meyers Buth* of counsel); *J. Glenn Davis; LoTempio & Brown, P.C.* (*Patrick J. Brown* of counsel); *Daniel B. Boeck, Frank Bogulski, Wesley M. Brown,* Blasdell, *James M. Byrnes,* Rochester, *E. Carey Cantwell,* Buffalo; *Law Office of A. Joseph Catalano,* Niagara Falls (*A. Joseph Catalano* of counsel); *Law Offices of John Trigilio,* Buffalo (*Elizabeth J. Ciambrone* of counsel); *Robert N. Convissar, Paul G. Dell, Thomas C. Farley,* Derby, *Noemi Fernandez-Hiltz,* Buffalo, *Philip S. Glickman,* Rochester, *Robert M. Goldstein,* Buffalo, *Thomas N. Graziani,* Williamsville, *Sean Dennis Hill,* Buffalo, *Alan S. Hoffman, Paul V. Hurley,* East Aurora, *John Keavey,* Buffalo, *James E. Kerrigan,* Ithaca, *Karen A. Korkuk,* Buffalo, *Judith M. Kubiniec, Amy L. Lupiani, Paul D. MacAulay,* Rochester, *John C. Putney,* Mount Morris, *Center for Community Alternatives,* Syracuse (*Alan Rosenthal* of counsel); *Timothy A. Roulan,* Old Forge, *Michael J. Stachowski,* Buffalo, *Lipsitz, Green, Scime & Cambria, LLP* (*Michael P. Stuermer* of counsel); *Michael J. Tallon,* Rochester, *Donald M. Thompson, Nelson S. Torre,* Buffalo; and *Zdarsky Sawicki & Agostinelli* (*Gerald T. Walsh* of counsel), for Terrence M. Connors and others amici curiae. The police violated appellant's

right to counsel under the New York State Constitution by interrogating him after an attorney who represented him on pending charges contacted the police and entered the proceeding as counsel in the matter under investigation. Under this Court's consistent precedent over four decades, appellant's purported "waiver" of the right to counsel was ineffective because it was extracted from him in the absence of his attorney. (*People v Arthur,* 22 NY2d 325; *People v Hobson,* 39 NY2d 479; *People v West,* 81 NY2d 370; *People v Lennon,* 243 AD2d 495; *People v Donovan,* 13 NY2d 148; *People v Grice,* 100 NY2d 318.)

*Kent S. Scheidegger,* Sacramento, California, for Criminal Justice Legal Foundation, amicus curiae. I. *People v LaValle*'s (3 NY3d 88 [2004]) conclusory, unsupported decision to throw out the entire death penalty is not entitled to preclusive effect as stare decisis. (*Lowenfield v Phelps,* 484 US 231; *Tuilaepa v California,* 512 US 967; *Jones v United States,* 527 US 373; *People v Hobson,* 39 NY2d 479; *Matter of Hynes v Tomei,* 92 NY2d 613; *Payne v Tennessee,* 501 US 808; *Dobbert v Florida,* 432 US 282; *Cupp v Naughten,* 414 US 141; *Estelle v McGuire,* 502 US 62.) II. The invalid sentence of CPL 400.27 (10) is severable. (*Marbury v Madison,* 1 Cranch [5 US] 137; *People ex rel. Alpha Portland Cement Co. v Knapp,* 230 NY 48; *Alaska Airlines, Inc. v Brock,* 480 US 678; *Bank of Hamilton v Lessee of Dudley,* 2 Pet [27 US] 492; *Matter of New York State Superfund Coalition v New York State Dept. of Envtl. Conservation,* 75 NY2d 88; *People v Smith,* 63 NY2d 41; *People v Davis,* 43 NY2d 17; *Roberts v Louisiana,* 431 US 633; *United States v Booker,* 543 US 220; *Matter of Hynes v Tomei,* 92 NY2d 613.) III. The New York death penalty statute is constitutional without the invalid sentence. (*People v LaValle,* 3 NY3d 88; *Matter of Hynes v Tomei,* 92 NY2d 613; *Bullington v Missouri,* 451 US 430; *Sattazahn v Pennsylvania,* 537 US 101; *Jones v United States,* 527 US 373; *People v Smith,* 63 NY2d 41; *Furman v Georgia,* 408 US 238; *Woodson v North Carolina,* 428 US 280; *United States v Harper,* 729 F2d 1216; *Morgan v Illinois,* 504 US 719.)

### OPINION OF THE COURT

CIPARICK, J.

Three years ago, in *People v LaValle* (3 NY3d 88 [2004]), we held that the jury deadlock instruction under CPL 400.27 violates our State Constitution. Because a deadlock instruction is both essential to a death penalty statute and necessary to conform with principles of due process, we were compelled to

invalidate the entire sentencing portion of the statute. We are now asked to decide whether an earlier attempt by a trial court to minimize the coercive effect of the flawed jury deadlock instruction warrants revisiting the issue of that instruction's constitutionality as applied to the present defendant. We hold that under the doctrine of stare decisis, defendant's death sentence must be vacated and the matter remitted to Supreme Court for resentencing.

I

In May 2000, defendant John Taylor and a coworker, Craig Godineaux, plotted to commit a robbery. Although Godineaux suggested robbing livery cabs, defendant convinced him that they should focus instead on fast-food restaurants as defendant was familiar with them, having previously worked at McDonald's and Wendy's. On the evening of Wednesday May 24, the two met near defendant's home in Queens with a plan to rob a Wendy's restaurant where defendant previously worked as an assistant manager. When the two met, defendant was carrying a roll of duct tape in a black plastic bag, a briefcase "to hold the money" and a loaded .380 semiautomatic handgun, which he had purchased on the street, in his "fanny pack" along with an extra ammunition clip.

Defendant and Godineaux arrived at Wendy's at approximately 10:55 P.M., minutes before closing time. The two ordered food and ate separately. Defendant took a moment to speak with the store manager, Jean Auguste, a former coworker. While eating, defendant "leered" at the two remaining customers. At approximately 11:15 P.M., one of the employees let those customers out of the restaurant and relocked the door. Shortly thereafter, defendant entered the employee area behind the counter and descended the stairs to the basement. Defendant entered the manager's office and pointed a gun at Auguste while demanding all of the money in the safe. Auguste took about $2,400 in bills and coins from the safe and put it in defendant's briefcase and bag, along with that evening's surveillance video. In response to Auguste's pleas, defendant assured him that he would only duct-tape the employees so he could get away. Auguste then got on the intercom and stated "tell everybody to come downstairs, we are having a meeting, it is important." Jaquoine Johnson heard the announcement and led everyone downstairs with Godineaux following. Once all of the employees had descended the stairs, Godineaux ripped a phone cord from a wall near the top of the stairs and joined the others.

Along with Johnson and Auguste, there were five other employees in the store—Anita Smith, Patricio Castro, Jeremy Mele, Ramon Nazario and Ali Ibadat. Defendant ordered them all to lie face down on the floor with their hands behind their backs. In the interim, defendant obtained the key to the restaurant's entrance from one of the employees. Meanwhile, Godineaux donned gloves, which he had brought with him, and with duct tape bound each of the employee's hands and mouth.[1] Auguste, who was having trouble breathing, managed to free his hands and remove the tape from his mouth. In response, Godineaux punched him in the face, yelled at him and retaped his hands and mouth.

Once all of the employees were bound, they were led to the nearby walk-in refrigerator and ordered to their knees. Godineaux then placed clear plastic bags, which defendant had retrieved from another room, over six of the employees' heads, and defendant placed a bag over the remaining employee's head. Johnson, who was able to see through his bag, saw defendant shoot Auguste in the head. After the shot, Smith started screaming "what happened." When another shot was fired, the screaming ceased. Defendant passed the gun to Godineaux and said "finish them." Godineaux, in turn, shot Nazario, Castro, Meli, Ibadat and Johnson—all in their heads and at close range. Following the shooting, defendant and Godineaux went upstairs, unlocked the door, exited the restaurant and relocked the door. Only Castro and Johnson survived.[2] The other five employees

---

**1.** Godineaux taped six of the employees and defendant taped the remaining one, Castro. In addition to taping Castro's hands and mouth, defendant also taped his eyes.

**2.** The testimony of Castro and Johnson differed only slightly at trial as to whether Smith was killed by the second or third shot.

Castro testified that he saw defendant in the restaurant and witnessed him go downstairs to the office. When Castro went downstairs with the others, his eyes, mouth and hands were taped. After he was brought into the refrigerator, he heard two quick shots. He then heard a woman scream which ceased upon a third shot. After hearing a fourth shot, he passed out not realizing he had been shot.

Johnson testified that he remembered everything upon regaining consciousness but that he initially claimed he had no recollection because he did not want to talk about it. He further testified that he remembered seeing defendant and Godineaux walk into the restaurant and order separately. Later, after being called to the basement, he saw defendant with a gun and was ordered to the floor. His eyes were not taped so he was able to see Auguste break free and Godineaux hit him in response. Although a bag was then placed over Johnson's head, it did not cover his right eye. He was thus able to see defen-

all died from gunshot wounds to the head.[3] At some point after defendant and Godineaux left, Castro regained consciousness, got free and called 911 for help using the office fax machine telephone. Defendant and Godineaux eventually parted ways.

Defendant quickly became the focus of a police investigation of the shootings. He was identified, in separate photo arrays, by a person who saw him leaving Wendy's that night and by one of the customers who was present in the restaurant when defendant had arrived.[4] The police also learned that defendant was a former employee who had been fired from this Wendy's location.[5] Upon learning from news reports that the police had identified him as a suspect in the shootings, defendant went to his sister's home in Suffolk County on the morning of May 26. However, the New York City Police Department had already contacted the Suffolk County police, who had agreed to arrange for surveillance of the home.

At around 4:00 P.M. that day, a 911 operator received a call from someone at the sister's house stating that a child was injured while riding a bicycle. The officers, responding to that call, were intercepted and shown a picture of defendant. When the responding officers arrived, they arrested defendant while the medics were treating the child. The police found the loaded .380 handgun that defendant used at Wendy's along with an extra clip in the "fanny pack" he was wearing. Inside his sister's home, the police also found defendant's suitcase which contained some of the clothing he wore during the shootings, the surveillance tape, approximately $1,500 in cash and one live .380 round.

Thereafter, three New York City police officers drove defendant to a detective squad in Queens. As defendant was placed in the car, he said "please get Craig. He's at SC&R right now. He's security just like me at 165th and Jamaica Avenue, you know, the coliseum." The officers tried to calm defendant, but he

---

dant shoot Auguste, hear Smith scream and hear another shot followed by silence. He then witnessed defendant pass the gun to Godineaux.

**3.** Mele also had a gunshot wound to his torso—the only person with two gunshot wounds. Thus the total number of wounds—seven head wounds plus one torso wound—corresponds with the eight discharged .380 shells that were found at the scene.

**4.** Defendant, with counsel present, was also later identified in a lineup at the precinct by two witnesses—the customer who identified his photo and Castro.

**5.** Additionally, at some point on May 26, a fingerprint found on the box of plastic bags in the storage room was linked to defendant.

continued to blurt out comments about how his life was in jeopardy because he was the only one who saw Craig shoot everyone at Wendy's. Defendant was then advised of his *Miranda* rights but he continued "rambling on" about Craig.[6] The police continued to assure defendant that he would be heard in full when they arrived at the precinct, and after about 10 minutes he stopped talking.[7]

At the precinct, defendant was again read his *Miranda* rights in the interview room and at 6:15 P.M., then-Detective Elizabeth Curcio began to interview him. The interview lasted just over one hour. During this time defendant made an oral statement and agreed to execute a written statement if Curcio drafted it for him. Curcio drafted an 11-page statement over the course of the next three hours. The statement was signed by Curcio and defendant. According to defendant's statements, Godineaux did not see the gun until he saw defendant with it in the basement. At that point, Godineaux grabbed the gun from defendant and shot Auguste while saying "[n]o witnesses" and screaming to defendant to give him the other clip. Defendant stated that he walked away and heard about nine shots.

At around midnight, defendant agreed to make a videotaped statement. While several assistant district attorneys questioned defendant during his video statement—which essentially mirrored his statements to Curcio—various detectives investigated the inconsistencies and gaps in defendant's confession. Most glaring was defendant's claim that Godineaux knew that there was an extra magazine with ammunition despite the fact that there was no indication that defendant ever mentioned it to him. In response to the questioning regarding this discrepancy, defendant admitted orally, and later in writing, that he shot Auguste and then gave Godineaux the gun and told him to "finish them."

---

**6.** Defendant and Godineaux had only known each other for about a month before the shootings and defendant only knew his first name, Craig.

Godineaux was arrested at work shortly after defendant. Due to Godineaux's mental retardation, the District Attorney's Office did not file a death notice against him and he was subsequently allowed to enter a plea in which he would be sentenced to life without parole for his role in the murders.

**7.** The police were contacted by an attorney claiming she represented defendant in a prior matter. Defendant disavowed that he wanted her representation in the instant matter and the investigation ensued after he signed a waiver of counsel. At defendant's request, his claim that his right to counsel was violated is being abandoned.

Defendant was tried by a jury and convicted of 20 counts—six for first-degree murder under various theories including intentional felony murder, multiple-victim murder and command murder.[8] After a sentencing phase trial during which defendant proffered his mitigating evidence, the jury returned a verdict in favor of death on three first-degree murder counts—count eight—as part of the same criminal transaction, defendant caused the deaths of more than one person (*see* Penal Law § 125.27 [1] [a] [viii]); count fourteen—in the course of a robbery, defendant killed Jean Auguste (*see* Penal Law § 125.27 [1] [a] [vii]); and count fifteen—in the course of a robbery, defendant killed Anita Smith (*see* Penal Law § 125.27 [1] [a] [vii]).[9] Defendant now appeals his conviction and sentence as of right under CPL 450.70 (1).

## II

On March 20, 2002, prior to jury selection, defendant moved for an order declaring the deadlock jury instruction under CPL 400.27 (10) unconstitutional and nonseverable. Defendant argued that the provision "injects arbitrariness into the sentencing proceeding and unconstitutionally coerces jurors into giving up their conscientiously held sentencing determinations in order to return a verdict and avoid the possibility of parole after as few as twenty years." Supreme Court, denying the motion in all respects, found that defendant was unable to surmount the statute's strong presumption of constitutionality.

After Supreme Court determined that the deadlock provision was constitutional, defense counsel asked for a jury instruction that defendant would never be released from jail. At the end of the penalty phase, the defense again requested that the judge tell the jury that he was "going to give [defendant] 175 years

---

**8.** Defendant was originally indicted on June 27, 2000, under Queens County indictment No. 1845/2000, for numerous crimes including 21 counts of first-degree murder based on theories of intentional felony murder and multiple-victim murder. On April 10, 2001, a second indictment was filed, under indictment No. 1012/2001, charging defendant with intentional felony murders under a command theory as well as attempted intentional felony murder of the two surviving victims. The indictments were consolidated by court order dated March 27, 2002.

**9.** The jury was not unanimous in seeking death or life without parole on counts sixteen through eighteen, which convicted defendant of first-degree felony murder for commanding the killing of Nazario, Ibadat and Mele in the course of a robbery. He later received consecutive sentences of 25 years to life on each of those counts.

and there is no practical[ ] possibility of getting out of jail." The judge responded:

> "And, therefore, they might as well, if they can't agree on death, give him life without parole.
>
> "The statute, the statute requires me not to, does not require me to say what I'm going to say. It requires only for me to tell them 20 to 25 years to life as to sentence. That is all it requires. What I am doing is something more. . . .
>
> "I decline to assure them and give them a guarantee today of what I will do in the future and you have your objection."

On November 25, 2002, the court charged the jury, in part:

> "Now, any decision by you to impose a sentence, whether of death or of life imprisonment without parole, would have to be unanimous. In other words, each juror would have to agree to it.
>
> "I am required to tell you that the law provides that in the event the jury fails to reach unanimous agreement with respect to the sentence, then I must sentence the defendant myself.
>
> "And the law provides that if I sentence the defendant, I must sentence him to life imprisonment, but I must also fix a point at which the defendant will become eligible for parole.
>
> "Under the law I must fix that point between twenty and twenty-five years for each count. In other words, on each count I would sentence the defendant to life imprisonment and order that he not become eligible for parole until he has served the minimum term that I fix, a term of between twenty and twenty-five years for each count.
>
> "I think it is fair to tell you, however, that the six [count]s of first degree murder, and the two counts of first degree attempted murder on which you have convicted the defendant, are precisely the type of crimes that almost always induce a judge to give the maximum sentence permissible.
>
> "In this case I would have the authority to sentence

the defendant, not only to the maximum on each count, but also to make those sentences run consecutively. So, the maximum sentence I could give and would almost certainly impose in this case, would be a sentence of 175 years to life, which means that the defendant would become eligible for parole, but only after he had served 175 years in jail."

Defendant now argues, in light of this Court's declaration in *People v LaValle* (3 NY3d 88 [2004]) that CPL 400.27 (10)'s deadlock jury instruction is unconstitutional, his death sentence must be vacated. We agree that *LaValle* is controlling and mandates defendant's resentencing.

## III

The deadlock jury instruction of our death penalty statute, CPL 400.27 (10), provides in relevant part:

"In its charge, the court must instruct the jury that with respect to each count of murder in the first degree the jury should consider whether or not a sentence of death should be imposed and whether or not a sentence of life imprisonment without parole should be imposed, and that the jury must be unanimous with respect to either sentence. The court must also instruct the jury that in the event the jury fails to reach unanimous agreement with respect to the sentence, the court will sentence the defendant to a term of imprisonment with a minimum term of between twenty and twenty-five years and a maximum term of life."

New York's death penalty statute, in its present form, was enacted in 1995 (*see* L 1995, ch 1). The coerciveness and constitutionality of its anticipatory deadlock jury instruction was questioned from its inception. Supreme Court in *People v Harris* ruled that CPL 400.27 (10) was unconstitutional and refused to charge it at the sentencing trial (*see* 177 Misc 2d 160, 164 [Sup Ct, Kings County 1998]). On appeal to this Court, defendant argued that Supreme Court had erred by severing the unconstitutional part of the statute. He further argued that the court compounded that error by simply responding "No" to a question by the jury that asked: "If the jury does not come to a unanimous verdict . . . does the penalty become life imprisonment without the possibility of parole?" However, we did not reach the issue in *Harris* as *Matter of Hynes v Tomei* (92 NY2d

613 [1998], *cert denied* 527 US 1015 [1999]) required vacating defendant's death sentence (*see People v Harris*, 98 NY2d 452, 496 [2002]).

The jury deadlock instruction was again challenged in *People v Cahill* (2 NY3d 14 [2003]), where the defendant argued that the instruction coerced jurors to vote for death because that was more palatable than the possibility that he would be paroled if they could not come to a unanimous agreement and had to leave sentencing in the hands of the judge. The defendant further argued that CPL 400.27 (10) could not be excised from the death penalty statute, because that would result in a sentencing scheme that was not foreseen by the Legislature—in essence, an impermissible form of judicial legislation. The majority did not reach the constitutional challenge because Cahill's two first-degree murder convictions were against the weight of the evidence and legally insufficient to support a conviction, respectively. Thus, death should not have been an option.

Two Judges of the Court in a concurring opinion in *Cahill* opined that, because of the gravity of the argument and the Court's constitutional obligation to review capital cases, we were required to address the coerciveness of CPL 400.27 (10)'s jury instruction and the impact it had on reliable sentencing (*see Cahill*, 2 NY3d at 76-77 [G.B. Smith, J., concurring]). Upon consideration of the deadlock issue, the concurring opinion ultimately concluded that the statute failed because "[i]t introduces a measure of uncertainty and unreliability into the deliberative process. Thus, there is a substantial risk that the jury verdict may not reflect the true conscience of the jury. As a constitutional matter, such a result cannot be countenanced in a capital case" (2 NY3d at 83 [G.B. Smith, J., concurring]).

Months later, the issue again came before the Court in *La-Valle* where we were faced with an otherwise valid death-eligible conviction. Defendant in that case challenged CPL 400.27 (10), "both on its face and as applied," on federal and state constitutional grounds (*LaValle*, 3 NY3d at 116). The majority opinion analyzed the deadlock jury instruction's constitutional flaws. We first acknowledged that New York's jury deadlock instruction was unique in that "[n]o other death penalty scheme in the country requires judges to instruct jurors that if they cannot unanimously agree between two choices, the judge will sentence defendant to a third, more lenient, choice" (*id.* at 117). We then explored the inherent coerciveness of placing the jury in that position. We looked to various studies, including a South

Carolina study of jurors who served in capital cases, which
" 'confirm[ed] that jurors' deliberations emphasize dangerous-
ness and that misguided fears of early release generate death
sentences' " (id., quoting Eisenberg and Wells, *Deadly Confu-
sion: Juror Instructions in Capital Cases*, 79 Cornell L Rev 1, 4
[Nov. 1993]). We further noted that whether or not the unseemly
jury instruction tended to sway a juror to vote for life without
parole rather than death, the "truth is that the deadlock provi-
sion is unconstitutional because of the risk that it might coerce
jurors into giving up their conscientious beliefs in order to reach
a verdict. This risk deprives defendants of the well-established
right to a fair trial under our case law and the State Constitu-
tion" (*LaValle*, 3 NY3d at 120 n 15).

> "By interjecting future dangerousness, the deadlock
> instruction gives rise to an unconstitutionally pal-
> pable risk that one or more jurors who cannot bear
> the thought that a defendant may walk the streets
> again . . . will join jurors favoring death in order to
> avoid the deadlock sentence . . . The choice of death
> results not through 'a comparison of views, and by
> arguments among the jurors themselves,' but
> through fear and coercion." (*Id.* at 118.)

Thus, based on our own precedent, "a coerced verdict 'ought
not be allowed to stand in any case, and least of all, in one
involving a human life' " (*id.* at 124, quoting *People v Sheldon*,
156 NY 268, 285 [1898]).

Nor were we convinced that the United States Supreme
Court's reasoning in *Jones v United States* (527 US 373 [1999])
mandated a different result. Although the *Jones* Court held that
"the Eighth Amendment does not require that the jurors be
instructed as to the consequences of their failure to agree" (527
US at 381), we held that our State Due Process Clause's greater
protection could not be reconciled with *Jones* as "death is
qualitatively different and thus subject to a heightened stan-
dard of reliability" (*LaValle*, 3 NY3d at 127).[10] This heightened
standard could not be satisfied if there is a plausible possibility

---

**10.** As it has routinely been observed:
"The historical differences between the Federal and State due
process clauses make clear that they were adopted to combat
entirely different evils . . . The Fourteenth Amendment was a
watershed—an attempt to extend and catalogue a series of
national privileges and immunities, thereby furnishing minimum
standards designed to guarantee the individual protection against

that jurors would base their life or death determination upon the fear that the defendant would be eventually released from prison (*see* 3 NY3d at 128). Thus, because our Due Process Clause requires that an anticipatory deadlock instruction be given to the jury and because the existing instruction provided by the Legislature was coercive, we struck the death penalty sentencing statute (*see id.* at 128-131).

Furthermore, we were not persuaded that the jury deadlock provision could be severed as our Due Process Clause requires that jurors be informed of the consequences of their actions (*see LaValle*, 3 NY3d at 130). This is because the penalty of death is entirely too severe to allow a jury to vote on the imposition of such a sentence without knowledge of what would occur if it failed to reach unanimity (*see id.*). Finally, we explicitly stated that:

> "We cannot, however, ourselves craft a new instruction, because to do so would usurp legislative prerogative. We have the power to eliminate an unconstitutional sentencing procedure, but we do not have the power to fill the void with a different procedure, particularly one that potentially imposes a greater sentence than the possible deadlock sentence that has been prescribed . . . We thus conclude that *under the present statute, the death penalty may not be imposed.* Cases in which death notices have been filed may go forward as noncapital first degree murder prosecutions" (*id.* at 131 [emphasis added]).[11]

## IV

*LaValle* made perfectly clear that the death penalty sentencing statute crafted by the Legislature was unconstitutional. That judgment stemmed from *LaValle*'s core holdings that our Due Process Clause requires an anticipatory deadlock instruction be given and that the existing provision was unconstitution-

___

the potential abuses of a monolithic government . . . In contrast, State Constitutions in general, and the New York Constitution in particular, have long safeguarded any threat to individual liberties, irrespective of from what quarter that peril arose" (*Sharrock v Dell Buick-Cadillac*, 45 NY2d 152, 160 [1978] [citations omitted]).

**11.** In apparent reliance on *LaValle*, no District Attorney has since filed a death notice in our state. Thus, the holding has not engendered uncertainty, or proven unworkable in application (*see People v Bing*, 76 NY2d 331, 347-348 [1990]).

ally coercive (*see* 3 NY3d at 120, 130). Since we could not craft a new instruction, we were constrained to say: "under the present statute, the death penalty may not be imposed" (*id.* at 131). Defendant, here, was thus sentenced to death under a facially unconstitutional statute.[12]

Our decision here is guided, first and foremost, by the principle of stare decisis.[13] It is well settled that *"[s]tare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process" (*Payne v Tennessee*, 501 US 808, 827 [1991]). "The doctrine also rests upon the principle that a court is an institution, not merely a collection of individuals, and that governing rules of law do not change merely because the personnel of the court changes" (*People v Bing*, 76 NY2d 331, 338 [1990]).

> "Distinctions in the application and withholding of *stare decisis* require a nice delicacy and judicial self-restraint. At the root of the techniques must be a humbling assumption, often true, that no particular court as it is then constituted possesses a wisdom surpassing that of its predecessors. Without this assumption there is jurisprudential anarchy" (*see People v Hobson*, 39 NY2d 479, 488 [1976]).

Hence, both the legitimacy and the ability of the judiciary to function dictate that legal issues that have been addressed by a jurisdiction should not be revisited every time they arise.

Stare decisis is deeply rooted in the precept that we are bound by a rule of law—not the personalities that interpret the law. Thus, the closeness of a vote bears no weight as to a holding's precedential value as a "controversy settled by a decision in which a majority concur should not be renewed without sound reasons" (*Semanchuck v Fifth Ave. & 37th St. Corp.*, 290 NY 412, 420 [1943]). "[O]rdinarily the rule so established will be

---

**12.** We recognize that the sentencing phase below took place before our decision in *LaValle* and that the trial judge diligently tried to balance the weighty constitutional quandaries in crafting the jury instruction. However, as the statute was ultimately held facially unconstitutional, there is no room for a judicial reformulation of the deadlock provision, nor is there any basis to review whether the instruction here was in fact coercive.

**13.** "Stare decisis et non quieta movere" is a Latin phrase that means "[t]o stand by things decided, and not to disturb settled points" (Black's Law Dictionary 1443 [8th ed 2004]).

adopted in all subsequent cases to which it is applicable, without any reconsideration of its correctness in point of law" (Henry Campbell Black, Law of Judicial Precedents, at 182 [1912]). The fact that reasonable minds may differ as to the result does not diminish the majority opinion's legal force.

Stare decisis, of course, also recognizes that the lessons of time may lead to a different result. Thus, the strong presumption that the law is settled by a particular ruling may be rebutted, but only in exceptional cases. For instance, a holding that leads to an unworkable rule, or that creates more questions than it resolves, may ultimately be better served by a new rule (*see e.g. Bing*, 76 NY2d at 347 ["Inasmuch as these appeals fall squarely within (our precedent) and exceptions cannot be recognized, the question remains whether the rule has become so unworkable that it should be abandoned"]).[14] However, our holding in *LaValle*—barely three years old—does not present such a rule. Instead, it spells out that death penalty cases can only go forward "as noncapital first degree murder prosecutions" until the Legislature enacts a noncoercive sentencing statute that properly informs the jury of the consequences of its actions (3 NY3d at 131).

Furthermore, although it is oft-stated that a court should "not . . . apply stare decisis as rigidly in constitutional as in nonconstitutional cases" (*Glidden Co. v Zdanok*, 370 US 530, 543 [1962]), such considerations are not warranted here. The rationale underlying the judiciary being more susceptible to revisiting precedent on constitutional issues is that the Legislature cannot change the constitution to correct an error found by a court. This is in stark contrast to the power the Legislature has to correct a statute and make its meaning clear, if it believes a court's interpretation was wrong. We are not presented with such a situation here as our constitutional ruling on CPL 400.27 (10) does not render the statute immune from legislative correction. Indeed, the needed correction may be as simple as enacting a sentencing statute that provides for life without parole if the jury cannot unanimously agree on death.

---

**14.** In *Bing*, after nearly a decade, we overruled *People v Bartolomeo* (53 NY2d 225 [1981]), a case that stood for the proposition that when a suspect was arrested, the police were charged with the knowledge of whether the suspect was previously represented by counsel in prior matters, preventing the suspect from waiving his or her right to counsel without the prior counsel present. The *Bartolomeo* rule, which rested on a "fictional attorney-client relationship," was shrouded in uncertainty and detrimental to effective law enforcement (*Bing*, 76 NY2d at 349, 347-351).

Thus, as we did in *LaValle*, we will continue to respect the Legislature's province.

## V

Perhaps mindful of the burden it faces in overturning such recent precedent, the People tweak their argument by conceding that *LaValle* was correctly decided as an as-applied constitutional challenge but that anything further was either plain error or dictum.[15] In support of this position, the People and the dissent misinterpret our constitutional jurisprudence by invoking *People v Stuart* (100 NY2d 412 [2003]) in an attempt to undermine *LaValle*'s holding. As *Stuart* has no application here, we reject that argument.[16]

In addressing an as-applied and facial challenge to an anti-stalking statute on void-for-vagueness grounds, we explained in *Stuart* that:

> "Because facial challenges to statutes are generally disfavored and legislative enactments carry a strong presumption of constitutionality, a court's task when presented with both a facial and as-applied argument is first to decide whether the assailed statute is impermissibly vague as applied to the defendant. If it is not and the statute provides the defendant with adequate notice and the police with clear criteria, that is the end of the matter . . .

> "It follows, therefore, that if a defendant makes an as-applied vagueness challenge and the court repudiates it, the facial validity of the statute is confirmed" (100 NY2d at 422 [citations omitted]).

In support of this principle, we cited to several void-for-vagueness cases that shared this analysis (*see Ulster Home Care v Vacco*, 96 NY2d 505, 510 [2001] ["Plaintiffs should have been required to show that the regulation was unconstitutional as applied to them. When a person's conduct falls within the proscriptions of a regulation, 'a vagueness challenge must be addressed to the facts before the court' " (citations omitted)];

---

**15.** The People's argument here is contrary to the position that was taken by the People in *LaValle*. The People in *LaValle* urged the Court *only* to consider the facial challenge as they believed the as-applied challenge was unpreserved.

**16.** Notably, there is not a single reference to *Stuart* in any of the three opinions issued in *LaValle*. Indeed, even Judge Rosenblatt, who authored *Stuart* and wrote separately in *LaValle*, did not mention that case.

*People v Nelson*, 69 NY2d 302, 308 [1987] ["It has often been said, however, that, except in rare circumstances not relevant here, a vagueness challenge must be addressed to the facts before the court . . . Thus, if the actions of the defendants are plainly within the ambit of the statute, the court will not strain to imagine marginal situations in which the application of the statute is not so clear"]; *Hoffman Estates v Flipside, Hoffman Estates, Inc.*, 455 US 489, 495 [1982] ["A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law"]).

Here, however, we are faced neither with a void-for-vagueness challenge nor with a constitutional challenge that is subject to the same confluence of concerns. When reviewing a void-for-vagueness challenge of a statute, a court must weigh the need for adequate notice against society's need for order and effective law enforcement (*see generally Stuart*, 100 NY2d at 420-421; *People v Shack*, 86 NY2d 529, 538-539 [1995]). Thus, when a person of ordinary intelligence should know that the conduct at issue is prohibited by a statute, and there are reasonable standards for enforcement, that person should not benefit from any superfluous discrepancy that is not applicable in that instance. This is in stark contrast with *LaValle*, where we were faced with a completely different set of concerns addressed to a defendant's right to a fair trial and the critical task of safeguarding fairness in death sentencing.

The concerns in *LaValle* focused on whether defendant was deprived of due process and his right to a fair trial in a capital proceeding by the coercive forces that were found to be masked in the language of CPL 400.27 (10). We deemed it necessary, regardless of a showing of actual prejudice, "to strike down the deadlock instruction in CPL 400.27 (10) because it creates the substantial risk of coercing jurors into sentencing a defendant to death in violation of our Due Process Clause" (*LaValle*, 3 NY3d at 128; *see also id.* at 120 n 15 ["(T)he deadlock provision is unconstitutional because of the risk that it might coerce jurors into giving up their conscientious beliefs in order to reach a verdict. This risk deprives defendants of the well-established

right to a fair trial under our case law and the State Constitution"]).[17]

We find fault in the dissent's view that *United States v Salerno* (481 US 739 [1987]) dictated a different result in *LaValle*—a contention never even raised in that case. *Salerno*'s proposition that to be successful "[a] facial challenge . . . must establish that no set of circumstances exists under which the Act would be valid" does not sit well with our state due process protections afforded to capital proceedings under these circumstances (*Salerno*, 481 US at 745).[18] In a capital appeal, the unacceptability of error and the need to protect liberties become glaringly apparent and call for heightened review (*see Harris*, 98 NY2d at 474 ["By its very nature a capital case requires the most meticulous and thoughtful attention. A mistake discovered years later may not be correctable"]). As such, neither *Salerno* nor *Stuart* adequately addresses a challenge that the capital sentencing procedure is inherently coercive and undermines proper consideration of mitigating and aggravating factors.[19] Thus, it was not error for us to review the facial challenge of CPL 400.27 (10) in *LaValle*. Nor is there any sound reason in law for us to now rewrite history and recategorize our holding as dictum, as the People and dissent urge.[20]

---

**17.** The People in *LaValle* cited to the trial court's ruling in *this* case as an indication of the constitutionality of CPL 400.27 (10)—an argument that was implicitly rejected by *LaValle*'s holding.

**18.** We also find perplexing the dissent's position that our analysis here should be the same as that employed in tax cases (*see* dissenting op at 167, citing *Matter of Moran Towing Corp. v Urbach*, 99 NY2d 443, 448 [2003]).

**19.** Furthermore, even if we were to agree with the People that *Stuart* applies here, certainly the lofty concerns surrounding capital appeals would place this as an exception to the general rule of performing as-applied challenges first (*see Stuart*, 100 NY2d at 424 n 10 ["we cannot agree that the Court's approach forecloses the possibility of successful facial challenges in the future"]). After all,

> "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case" (*Woodson v North Carolina*, 428 US 280, 305 [1976]).

**20.** The dissent's academic assessment of *LaValle*'s core holdings as dicta glosses over its bases which are that CPL 400.27 (10) is unconstitutionally coercive, that a deadlock jury instruction is constitutionally necessary under state due process standards and that we are obligated to review capital cases

Moreover, we cannot agree with the dissent that, under the guise of dictum, "self-correction" is mandated or even warranted (*see* dissenting op at 165), because doing so would condone a trial court's remaking of an unconstitutional statute into a new statute not subject to the legislative process. Surely, it was within our role to otherwise prevent the enforcement of an unconstitutional death penalty statute, as we did in *LaValle*, until the Legislature chooses to respond. To deem the courts bereft of such a power would undermine our system of checks and balances between our two coequal branches of government.

The People argue, further, that we erred in *LaValle* by not severing or repairing the flawed statute. As previously discussed, the idea of a jury instruction that fails to properly inform the jury of the consequences of its actions is offensive to our notion of due process (*see LaValle*, 3 NY3d at 128 ["the absence of an instruction would lead to death sentences that are based on speculation, as the Legislature apparently feared when it decided to prescribe the instruction"]). Thus, given our holding and our responsibility of safeguarding those rights afforded under our State Constitution, we were duty-bound to invalidate the sentencing statute (*id.* at 130 ["(R)ecognizing the gravity of capital punishment and the concomitant need for greater certainty in the outcome of capital jury sentences, we hold that providing no deadlock instruction in the course of capital sentencing violates our Due Process Clause. Our conclusion is buttressed by the clear legislative intent that there be a jury instruction on the consequences of a deadlock"]). Conscious of our limited role, we refused to "usurp legislative prerogative" and craft a new statute (*id.* at 131 ["We have the power to eliminate an unconstitutional sentencing procedure, but we do not have the power to fill the void with a different procedure, particularly one that potentially imposes a greater sentence than the possible deadlock sentence that has been prescribed"]).

Furthermore, comparing *LaValle* with *Matter of Hynes*, where severability was proper, offers an insightful contrast. In *Matter of Hynes* we severed an unconstitutional portion of the death penalty statute that penalized those who exercised their right to trial (*see* 92 NY2d at 628-629). Under the existing statute, a

---

with heightened scrutiny. Furthermore, the dissent places far too much emphasis on *LaValle*'s failure to accentuate the word "facial" in its holding. "The careful reader" (dissenting op at 175) can easily discern that *LaValle* was a facial ruling—to be certain, it is utmost apparent in its analysis, holding and decretal paragraph.

death-noticed defendant was permitted to plead guilty to first-degree murder and avoid the possibility of a death sentence. Thus, death could only be imposed on those who insisted on their innocence (*see id.* at 620). We determined that the offending part of the statute could be severed as it did not affect the conduct during the trial or penalty phase and that it still permitted plea bargaining (*see id.* at 628, 630 ["Thus, while a defendant may not plead guilty to first degree murder while a notice of intent to seek the death penalty is pending, plea bargaining to lesser offenses even when a notice of intent is pending, or to first degree murder in the absence of a notice of intent, remains unaffected"]).[21] In *LaValle,* on the other hand, the invalid portion of the statute was inextricably interwoven with the sentencing procedure and necessary to effectuate the Legislature's intent. As correctly recognized in the concurring opinion, any attempt to sever the offending portion of the statute would result in a "misshapen fragment of the original" drafted by a court's impermissible use of a legislative pen (concurring op at 158).

Finally, we reject the People's invitation to rewrite the deadlock instruction. This is because, under the proposed scheme, we would be obliged to materially rework the death penalty statute in a manner contrary to our role. In order to function, as proposed by the People and the dissent, a trial court would be required to inform the jury in advance the sentence it would likely impose in the event of a deadlock.[22] To do so under the present statute would require the court to act without the benefit of a presentencing report in violation of CPL 380.30 and 390.20. Additionally, the new framework would be repugnant to the Legislature's intent as the court would have to conduct some sort of actuarial analysis and health assessment to determine a defendant's expected longevity as well

---

**21.** However, we did ultimately vacate all death sentences resulting from trials that occurred while the offending plea provision was still in effect (*see Harris,* 98 NY2d at 496; *People v Mateo,* 2 NY3d 383, 399 [2004], *cert denied* 542 US 946 [2004]; *People v Shulman,* 6 NY3d 1, 17 [2005]).

**22.** The charge actually given here injects new concerns of non-neutrality by permitting the trial court to give its opinion as to the weight of the mitigating evidence. The trial court's declaration that these were "precisely the type of crimes that almost always induce a judge to give the maximum sentence permissible" and that the court "would almost certainly impose" a sentence of 175 years to life could be interpreted by a juror to mean that just as the judge sees no reason for leniency nor should the jury give weight to the mitigating factors and that it too should give the maximum sentence permissible—death.

as a thorough examination of the existence of convictions that may require consecutive sentencing.[23] We would ultimately be left with capital punishment only for the aged, frail and those convicted of crimes eligible for consecutive sentencing—an entirely new capital punishment statute (*cf. McMinn v Town of Oyster Bay*, 66 NY2d 544, 552-553 [1985, Kaye, J., concurring] ["(A) party may challenge the validity of a statute on its face by asserting the rights of others if individual applications cannot be meaningfully separated from one another" (citation omitted)]; *Association of Surrogates & Supreme Ct. Reporters Within City of N.Y. v State of New York*, 79 NY2d 39 [1992] [An unconstitutional statute should not be severed if its only application would be for a small subset of the original class]).[24]

## VI

Like *LaValle*, our holding here is grounded in the irrevokable nature of capital punishment as well as "the concomitant need for greater certainty in the outcome of capital jury sentences" (3 NY3d at 130). We do not agree that the Court erred in *LaValle*, or that our holdings were dicta, and thus we are ultimately left exactly where we were three years ago: the death penalty sentencing statute is unconstitutional on its face and it is not within our power to save the statute. *LaValle* is thus entitled to full precedential value. The Legislature, mindful of our State's due process protections, may reenact a sentencing statute that is free of coercion and cognizant of a jury's need to know the consequences of its choice.

Accordingly, the judgment of Supreme Court should be modified by vacating the sentence of death and remitting to that

---

**23.** To be clear, the repugnant notion is not that of a court being confronted with actuarial data (*see* dissenting op at 173-174). Rather it is placing the court in a position in which it must in each case determine if a defendant is close enough to the end of life before the jury can be instructed on capital sentencing. Not a scintilla of legislative history supports such a paradigm.

**24.** The dissent contends that the statute would only "appl[y] to a core group of defendants [those subject to consecutive sentencing] charged with the worst crimes," a notion unoffensive to legislative intent (dissenting op at 171). This is simply false as the statute's application would also encompass aberrational groups of defendants like the aged and terminally ill. Further, the dissent wrongly assumes that those subject to consecutive sentencing are always the ones who commit the "worst of the worst" crimes (dissenting op at 169) as various multiple murders are not subject to consecutive sentencing (*see e.g. People v Rosas*, 8 NY3d 493, 498 [2007] [consecutive sentences not appropriate for double murder during the same transaction]; Penal Law § 125.27 [1] [a] [xi] [the serial killer provision is considered a single crime despite involving multiple murders]).

court for resentencing in accordance with CPL 470.30 (5) (c) and Penal Law §§ 60.06 and 70.00 and, as so modified, affirmed.[25]

SMITH, J. (concurring). I concur in the result, on constraint of *People v LaValle* (3 NY3d 88 [2004]).

I

The two central holdings of *LaValle* are that the anticipatory deadlock instruction required in capital trials by CPL 400.27 (10) is unconstitutional, and that a different anticipatory deadlock instruction, which only the Legislature can provide, is constitutionally required. Judge Graffeo, Judge Read and I dissented from both holdings. In this case, no party or amicus asks us to overrule the first holding, but amicus Criminal Justice Legal Foundation, with the tepid endorsement of the People, asks us to overrule the second. The Court is unanimous in rejecting the invitation—indeed, all six of my colleagues simply ignore it. I will explain briefly why I think the second holding of *LaValle* should not be overruled.

The policies underlying the doctrine of stare decisis, which include stability, predictability, respect for our predecessors and the preservation of public confidence in the courts, are at their strongest where, as here, a court is asked to change its mind although nothing else of significance has changed. No one suggests that any development in the last three years, either in the law or the law's effect on the community, has changed the context in which *LaValle* was decided. Indeed, we are asked to revive the very same statute held invalid in *LaValle*—not a theoretically impossible step, but a radical one. So far as I can tell, we have never done such a thing, and the occasions on which other courts have done it are rare (*see generally* Treanor and Sperling, *Prospective Overruling and The Revival of "Unconstitutional" Statutes*, 93 Colum L Rev 1902 [1993]).

It is true that stare decisis generally has less force when applied to a precedent that interprets a constitution (*People v Bing*, 76 NY2d 331, 338 [1990]). This is because an error in constitutional interpretation, if not corrected by the courts, cannot be corrected at all except through the difficult process of constitutional amendment. But here, as the plurality opinion

---

**25.** Defendant has requested without objection from the People that other issues not be reviewed if the Court vacates his death sentence based on *LaValle*.

points out (plurality op at 149-150), the Legislature can undo most, though not all, of *LaValle*'s effect by passing a simple statute. *LaValle* reads the Constitution to require an anticipatory deadlock instruction telling the jurors, in substance, that the consequence of a hung jury will be life without parole. To enact such an instruction would be to redesign a relatively minor feature of the death penalty statute, and it is easy to do if the Legislature wants to do it. I thought, and still think, that *LaValle* was wrong in holding the redesign to be required, but the harm done by the error does not justify casting stare decisis aside.

## II

*LaValle* also held, or at least said, "that under the present statute, the death penalty may not be imposed" (3 NY2d at 131)—i.e., that the statute was invalid not just as applied to La-Valle, but in all of its applications. The dissent, of which I was the author, said nothing about this feature of the *LaValle* decision. In my case, at least, that silence was not an oversight; I was silent because I thought then, as I think now, that any attempt to save a remnant of the death penalty statute through an exercise in "application severability" would be a mistake. Perhaps, as today's dissent suggests (dissenting op at 164), the *LaValle* majority should have explained why application severability would not work; I will offer an explanation now.

I agree with much that is said in the dissent. Certainly, there was nothing coercive about the charge the trial judge gave in this case, and the statute did not prohibit him from giving it. Thus, there are cases, of which this is one, in which the 1995 death penalty statute could, under the reasoning of *LaValle*, be constitutionally applied. The question of application severability is whether a statute governing only those cases would be consistent with the intent of the Legislature that enacted the broader statute (*see Association of Surrogates & Supreme Ct. Reporters Within City of N.Y. v State of New York*, 79 NY2d 39, 47-48 [1992]).

The dissent says yes, arguing, in effect, that the 1995 Legislature was so eager to enact a death penalty that it would have accepted almost anything that would survive a court test (*see* dissenting op at 171). There is no doubt some historical truth to this, but I approach the issue differently. I ask whether the death penalty statute, after being altered to comply with *La-Valle*, is one a sensible Legislature that anticipated the *LaValle*

decision might have enacted, and whether it bears a reasonable resemblance to the statute the Legislature did enact. I answer both of these questions no. The statute that would remain after the dissent's proposed rescue operation would be a misshapen fragment of the original—and to achieve even that result would require a rewriting of the statute that would make it less the creation of the Legislature than of this Court.

In an effort to remove the *LaValle* problem from the statute, the dissent would rewrite it to provide that, before the death penalty can be considered, the trial judge must (or, perhaps, may) decide whether he or she will impose consecutive or concurrent sentences in the event of a jury deadlock. If the decision is for concurrent sentences, death is off the table, but a judge who chooses consecutive sentences may, if those sentences add up to more than the defendant's life expectancy, announce that decision to the jury, and then let the jury choose between death and life. This describes what Justice Fisher did here—but he did it before *LaValle* was decided, and therefore defendant made no objection to the procedure. (Indeed, defendant asked for an even stronger instruction than the one Justice Fisher gave.) In the post-*LaValle* world the dissent envisions—where a procedure like this is an indispensable prerequisite to a death penalty—no defendant will consent to it. Defendants will argue that it is unprecedented, unauthorized by statute, and unfair for a judge to make an advance promise to a jury about what a sentence will be. The argument has some merit: Is not a defendant entitled to be sentenced by a judge unconstrained by any previous commitment?

I recognize that this problem may be more theoretical than practical. Most capital cases, like this one, involve horrible crimes that seem to cry aloud for the longest possible prison sentence as the only acceptable alternative to the death penalty. But the principle that the sentencer should keep an open mind until he or she actually pronounces sentence is still an important one.

Perhaps the Legislature could validly set that principle aside in some situations, and could create some procedures to make the sentencing promise more defensible; it might, for example, adopt a "scheduling" change of the kind suggested by the dissent, designed to make sure that the presentencing report precedes the judge's charge at the punishment trial (dissenting op at 173-174). But the Legislature has not done this. The whole new way of handling death cases suggested by the dissent is one that

judges have thought up. It is one thing to say that a decision by the Legislature to adopt this peculiar procedure would be valid; it is another for a court to surmise that the 1995 Legislature would have adopted it, with no more basis for the surmise than that Legislature's favorable view of capital punishment (*cf. Reno v American Civil Liberties Union*, 521 US 844, 884 [1997] [declining to "impose a limiting construction" on a statute that "provides no guidance what ever for limiting its coverage"]; *Randall v Sorrell*, 548 US 557, —, 126 S Ct 2479, 2500 [2006] [rejecting severability where it would have required writing words into the statute or guessing at legislative intent]).

The substantive problems with the dissent's reconstructed statute are even more serious than the procedural ones. The dissent suggests that the *LaValle* problem can be solved by reducing the class of defendants eligible for execution to those whose sentence in the event of deadlock would be "so lengthy in relation to life expectancy" that they would certainly die before being paroled (dissenting op at 174). But neither our Legislature nor any legislature anywhere, so far as I know, has adopted a "life expectancy" test for death eligibility—perhaps because such a test is so plainly a bad idea. Life expectancy depends on age and state of health, and neither of those should be a basis for deciding whom to execute.

The dissent recognizes this problem, but underestimates its seriousness. No doubt there will be few 70-year-old first degree murderers (*see* dissenting op at 172), but what about 36 year olds? John Taylor was 36 at the time of the Wendy's murders. If he had killed only two people instead of five, he might, in the event of a jury deadlock, have faced a maximum sentence of 50 years. Would that, under the dissent's proposed rule, be enough to make him eligible for the death penalty? What if he were 42? Certainly, on some hypothetical but plausible scenario, Taylor could be executed while, under *LaValle*, a 20 year old who committed the exact same crimes could not be. This does not make sense.

Perhaps, by doing even more surgery on the statute than the dissent proposes, we could solve this problem. The statute might be rewritten to make age and health irrelevant, by limiting the death sentence to defendants facing at least, say, 75 years in consecutive sentencing; the dissent may be obliquely suggesting such an arbitrary cutoff, in its remark that "a defendant-specific 'actuarial analysis' is not required" (dissenting op at 174). But the dissent does not embrace a simple minimum-years rule,

perhaps recognizing that to do so would be to travel too far from the statute the Legislature actually enacted.

I conclude that the *LaValle* majority was right to say that its holdings rendered the death penalty statute wholly invalid. I wish it were otherwise. Like the dissenters, I would prefer to save something of the statute, not because I want to help either side of the argument over the death penalty, but because I believe that on this issue, as on most other controversial issues of public policy, courts should defer to what legislatures decide (*cf. Hernandez v Robles*, 7 NY3d 338 [2006]). I continue to think *LaValle* was an unjustified interference with legislative authority. But, as I pointed out above, *LaValle* did not render the Legislature powerless. The Legislature can, if it has the will, repair the death penalty statute or repeal it. In doing either, it would bring the capital punishment issue back into the realm of democratic decision-making, where it belongs.

READ, J. (dissenting). In *People v LaValle* (3 NY3d 88 [2004]), the death sentence was vacated because the trial judge gave a coercive deadlock instruction to the jury. But no such coercive instruction was given in this case. Here, defendant John Taylor's death sentence is vacated on the basis of a *non*-coercive deadlock instruction. Fair-minded citizens might well be forgiven for wondering whether the Court of Appeals is simply unwilling ever to uphold a death sentence, no matter how the law is written (or may be rewritten), no matter how carefully the trial judge and the jury carry out their responsibilities. I respectfully dissent.

I.

The Court's Decision in *LaValle*

The deadlock instruction is set forth in CPL 400.27 (10), which deals with summations and the charge to the jury in the separate sentencing proceeding that follows a defendant's conviction of capital murder. This provision states in its entirety as follows:

> "At the conclusion of all the evidence, the people and the defendant may present argument in summation for or against the sentence sought by the people. The people may deliver the first summation and the defendant may then deliver the last sum-

mation. Thereafter, *the court shall deliver a charge to the jury on any matters appropriate in the circumstances.* In its charge, the court must instruct the jury that with respect to each count of murder in the first degree the jury should consider whether or not a sentence of death should be imposed and whether or not a sentence of life imprisonment without parole should be imposed, and that the jury must be unanimous with respect to either sentence. *The court must also instruct the jury that in the event the jury fails to reach unanimous agreement with respect to the sentence, the court will sentence the defendant to a term of imprisonment with a minimum term of between twenty and twenty-five years and a maximum term of life.* Following the court's charge, the jury shall retire to consider the sentence to be imposed. Unless inconsistent with the provisions of this section, the provisions of sections 310.10 ['Jury deliberation; requirement of; where conducted'], 310.20 ['Jury deliberation; use of exhibits and other material'] and 310.30 ['Jury deliberation; request for information'] shall govern the deliberations of the jury" (emphasis added).

In *LaValle*, the jury found the defendant guilty of first-degree murder in the course of and in furtherance of first-degree rape (Penal Law § 125.27 [1] [a] [vii]). The trial judge delivered a short, unembellished instruction to the jury on the subject of potential deadlock, advising simply that "in the event that you fail to reach unanimous agreement [on death or life without parole], then I will sentence the defendant to life imprisonment with a minimum term of between 20 and 25 years for Murder, 1st Degree." On appeal, we "address[ed] the constitutionality of [this] 'deadlock instruction' " (3 NY3d at 116).

We started our analysis by surveying several empirical studies on juror behavior regarding capital sentencing, which concluded that "jurors tend to grossly underestimate how long capital murderers not sentenced to death usually stay in prison"; and that "the sooner jurors think a defendant will be released from prison, the more likely they are to vote for death and the more likely they are to see the defendant as dangerous" (*id.* at 117 [internal quotation marks and citations omitted]). As a result, we reasoned that the deadlock instruction was objectionable on two related grounds. First, the instruction suggested that the defendant might be paroled in as few as 20 years if the jurors

proved unable to achieve unanimity, thus introducing into their deliberations a consideration that was not a statutory aggravator—the defendant's future dangerousness. Second, "[b]y interjecting future dangerousness, the deadlock instruction [gave] rise to an unconstitutionally palpable risk that one or more jurors who [could not] bear the thought that a defendant [might] walk the streets again after serving 20 to 25 years [would] join jurors favoring death in order to avoid the deadlock sentence" (*id.* at 118). At the conclusion of this discussion, we stated that "[w]e hold today that the deadlock instruction required by CPL 400.27 (10) is unconstitutional under the State Constitution *because of the unacceptable risk that it may result in a coercive, and thus arbitrary and unreliable, sentence*" (*id.* at 120 [emphasis added]).

We buttressed this holding with discussions of the legislative debate on the deadlock instruction; federal precedent, most prominently the United States Supreme Court's decision in *Jones v United States* (527 US 373 [1999]); and New York precedent on coerced verdicts. We stated that we regarded *Jones* "as unfaithful to the often repeated principle that death is qualitatively different and thus subject to a heightened standard of reliability" (*id.* at 127), which our State Constitution mandated. Accordingly, we concluded that it was

> "necessarily our responsibility to strike down the deadlock instruction in CPL 400.27 (10) *because it creates the substantial risk of coercing jurors into sentencing a defendant to death in violation of our Due Process Clause*. The deadlock instruction is invalid under our own case law condemning coercive instructions, and the State Constitution's Due Process Clause, providing greater protection than its federal counterpart. Consequently, defendant's death sentence must be set aside" (*id.* at 128 [emphasis added]).

Next, we "conclude[d] that the absence of any instruction [was] no better than the current instruction under our constitutional analysis," and so again "decline[d] to adopt *Jones*" (*id.*). We reasoned that without an instruction as to the consequences of a deadlock, jurors might speculate, "as the Legislature apparently feared when it decided to prescribe the [deadlock] instruction" (*id.*). We again pointed to empirical studies to support the view that "jurors might fear that the failure to reach a unanimous verdict would lead to a defendant's release, retrial or

sentence to an even lesser term than the one currently prescribed in the deadlock scenario [a minimum of 20 to 25 years to life]"; and that "[i]ndeed, a key motivation for jurors to vote for the death penalty is undoubtedly their fear that a defendant will otherwise pose a danger on the streets" (*id.*).

In this section of the opinion, we articulated our holding in two related ways. First, we stated that "[w]e hold that in this case the Due Process Clause of the New York Constitution requires a higher standard of fairness than the Federal Constitution as interpreted by the *Jones* majority" (*id.* at 129).[1] Second, "we [held] that providing no deadlock instruction in the course of capital sentencing violates our Due Process Clause" (*id.* at 130). As further support for these holdings, we called attention to "the clear legislative intent that there be a jury instruction on the consequences of a deadlock," and court rules and legislative enactments to this effect in eight states (*id.*).

At the end of the discussion of the deadlock instruction, we determined that "[w]e cannot . . . ourselves craft a new instruction, because to do so would usurp legislative prerogative" (*id.* at 131). We then made the following pronouncements, which lie at the heart of our quarrel with the majority on this appeal: "We thus conclude that under the present statute, the death penalty may not be imposed. Cases in which death notices have been filed may go forward as noncapital first degree murder prosecutions" (*id.*).

In sum, *LaValle* held that the deadlock instruction delivered by the trial judge in that case violated the Due Process Clause of our State Constitution by creating a substantial risk that a juror favoring life without parole would be coerced into voting for the death sentence so as to prevent the defendant's eventual release on parole. In addition, *LaValle* held that the Due Process Clause of our State Constitution mandates that our death penalty statute include a deadlock instruction, which only the Legislature may devise.

I continue to believe that *LaValle* was wrongly decided for the reasons articulated by Judge R.S. Smith in his dissent, which I joined. Nonetheless, I accept the foregoing holdings as binding

---

1. As the *LaValle* dissent noted, although *Jones* was a 5-4 decision, not one of the nine Justices endorsed the idea that the Federal Constitution mandates an anticipatory instruction in a capital case on the consequences of deadlock (*see* 3 NY3d at 146-147).

precedent for reasons of stare decisis. The majority has now, however, chosen to convert the spare closing comment in *La-Valle* that "under the present statute, the death penalty may not be imposed" into our "holding" in that case that "the death penalty sentencing statute is unconstitutional on its face" (plurality op at 155).

There was no discussion in *LaValle* of the deadlock instruction's facial constitutionality; the opinion is devoid of any legal reasoning to support a holding that the deadlock instruction in CPL 400.27 (10) is facially unconstitutional. While "both the legitimacy and the ability of the judiciary to function dictate that legal issues that have been addressed by a jurisdiction should not be revisited every time they arise" (plurality op at 148), this maxim presupposes that the legal issue in question has, in fact, been analyzed and decided by a court. To the extent that any judicial utterance in *LaValle* may be read as purporting to hold the deadlock instruction facially unconstitutional, it does not meet this test and is dictum. ("A judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word 'hold' " [*United States v Rubin*, 609 F2d 51, 69 n 2 (2d Cir 1979, Friendly, J., concurring)].)

In the New York University School of Law's annual James Madison Lecture in 2005, Judge Pierre N. Leval of the United States Court of Appeals for the Second Circuit discussed the hazards inherent in the failure of courts to distinguish between dictum and holding (*see* Leval, Madison Lecture: *Judging Under the Constitution: Dicta about Dicta*, 81 NYU L Rev 1249 [2006]). Two of his observations are particularly telling in the context of this appeal.

First, Judge Leval set out a handy test to separate dictum from holding:

> "To identify dictum, it is useful to turn the questioned proposition around to assert its opposite, or to assert whatever alternative proposition the court rejected in its favor. If the insertion of the rejected proposition into the court's reasoning, in place of the one adopted, would not require a change in either the court's judgment or the reasoning that supports it, then the proposition is dictum. It is superfluous. It had no functional role in compelling the judgment" (*id.* at 1257).

Here, the "questioned proposition" is that the deadlock instruction is facially unconstitutional, and "its opposite" is that the deadlock instruction is, in fact, facially constitutional. If we applied this analysis to *LaValle*, our judgment in the defendant's favor would not have changed because the deadlock instruction delivered by the trial judge created a substantial risk of a coerced verdict of death. Any assertion in *LaValle* about whether the deadlock instruction was facially unconstitutional was "superfluous" to this reasoning and "had no functional role in compelling" the judgment.

Second, Judge Leval observed that "[h]owever grievous the errors a court commits when it writes dictum disguised as holding, those errors would be neutralized if the next court would *recognize the prior dictum as nonbinding and go on to grapple with and decide the issue*" (*id.* at 1268-1269 [emphasis added]). The way the majority now treats the *LaValle* dictum as precedent is a cautionary tale in this regard. Wrapping itself in a false mantle of stare decisis, the majority ignores the legal issues presented by this case. If ever so politely, the majority even chides the People for having the temerity to prosecute an appeal in a case where "we are ultimately left exactly where we were three years ago" (plurality op at 155).[2]

Rather than shrinking defensively from the least suggestion of error or inadvertence, the plurality should have taken the path of self-correction advised by Judge Leval. The plurality should have squarely confronted and decided the legal issues raised by this appeal: whether the deadlock instruction was constitutional as applied to the defendant in this case, and whether, even if it was, his conviction must nonetheless be vacated because the deadlock instruction in CPL 400.27 (10) is facially unconstitutional. I now turn to those issues.

## II.

### The Deadlock Instruction in This Case

In keeping with CPL 400.27 (10), the trial judge informed the jury that in the event of deadlock he would sentence defendant

---

**2.** Unaccountably, the plurality also spills a great deal of ink defending our decision in *LaValle* that the deadlock instruction is not severable from an attack that the People do not mount (plurality op at 153-154). The People took the position on this appeal that, while they agreed on the merits with the *LaValle* dissent, they "operate[d] under the *LaValle* Court's reasoning, accepting . . . as *stare decisis*" its rulings that the deadlock instruction was unconstitutionally coercive as applied in that case, and was not severable from the remainder of the statute.

himself; that the law required him to "sentence [defendant] to life imprisonment," but also to "fix a point at which the defendant [would] become eligible for parole"; and that the law further required him to "fix that point between twenty and twenty-five years for each count." He then provided further clarification to the jury, advising that "[i]n other words, on each count I would sentence the defendant to life imprisonment and order that he not become eligible for parole until he had served the minimum term that I fix, a term of between twenty and twenty-five years for each count."

The judge next placed what he had just said in the context of the case before the jury. He informed the jurors that he thought it "fair to tell" them

> "that the six [count]s of first degree murder, and the two counts of first degree attempted murder on which you have convicted the defendant, are precisely the type of crimes that almost always induce a judge to give the maximum sentence permissible.

> "In this case I would have the authority to sentence the defendant, not only to the maximum on each count, but also to make those sentences run consecutively. So, the maximum sentence I could give and would almost certainly impose in this case, would be a sentence of 175 years to life, which means that the defendant would become eligible for parole, but only after he had served 175 years in jail."

No rational juror listening to this charge could have harbored any reasonable fear that a deadlock might lead to defendant's eventual release back into the community. Thus, the deadlock instruction delivered in this case simply did not pose the risk of a coerced and unreliable verdict of death that caused us to vacate the death sentence in *LaValle*.

Moreover, the trial judge was clearly empowered to give the charge that he gave. Section 400.27 (10) mandates that "the court *shall deliver* a charge to the jury on *any matters appropriate in the circumstances*" (emphasis added). Here, the trial judge thought it "fair" to communicate truthful and accurate information to the jury as to the "almost certain[ ]" practical consequences of a deadlock in the circumstances of this case. There was nothing wrong with this; in fact, it is exactly what the trial judge should have done to protect the constitutional rights of a defendant on trial for his life (*see Gregg v Georgia*, 428 US 153,

192-193 [1976]; *see also California v Ramos*, 463 US 992, 1009 [1983]).

Defendant contends, however, that the charge amounted to "judicial rewriting" of the deadlock instruction in contravention of CPL 400.27 (10) and our decision in *LaValle*. This is incorrect. The trial judge gave the deadlock instruction required by the statute, and then explained its implications to the jury. Nothing in section 400.27 (10) forbids this, and, in this pre-*LaValle* case, it is commendable that the judge took the extra step to extinguish any possibility of a coercive instruction. If the Legislature had wanted to prevent a trial judge from expanding on the deadlock instruction, it surely could have and would have done so (*compare* CPL 400.27 [10], *with* CPL 300.10 [3] [setting out within quotation marks the exact words that a trial judge must charge "without elaboration" where a defendant has raised the affirmative defense of lack of criminal responsibility by reason of mental disease or defect]). As for our decision in *LaValle*, we merely stated there that the Court of Appeals could not craft a new generic deadlock instruction to replace the existing one in CPL 400.27 (10). It perhaps bears repeating that the trial judge here did, in fact, deliver the statutorily required deadlock instruction. I therefore conclude that the deadlock instruction given in this case was not unconstitutionally coercive under the analysis in *LaValle*. The deadlock instruction was constitutionally applied to defendant.

## III.

### Facial Constitutionality of the Deadlock Instruction

Our precedent is well-established: "A party mounting a facial constitutional challenge bears the substantial burden of demonstrating that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment. In other words, the challenger must establish that no set of circumstances exists under which the Act would be valid" (*Matter of Moran Towing Corp. v Urbach*, 99 NY2d 443, 448 [2003, Ciparick, J.] [internal quotation marks and citations omitted], quoting *Cohen v State of New York*, 94 NY2d 1, 8 [1999] and *United States v Salerno*, 481 US 739, 745 [1987]; *see also People v Stuart*, 100 NY2d 412, 421 [2003] ["'A successful facial challenge means that the law is invalid *in toto*—and therefore incapable of any valid application" (internal quotation marks and citations omitted)]). The general approach taken by the courts is to "limit

the solution to the problem" and "enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact" (*Ayotte v Planned Parenthood of N. New England*, 546 US 320, 328, 329 [2006] [citations omitted]).[3]

We decided in *LaValle* that the deadlock instruction is not severable from the other statutory provisions authorizing the death penalty. The question therefore becomes whether the constitutional and unconstitutional *applications* of the deadlock instruction are severable. If they are not, defendant's death sentence must be vacated even though the deadlock instruction was constitutionally applied to him. Defendant, while conceding that in certain circumstances the statute may be constitutionally applied, offers three reasons why the Court should take this extraordinary step, which is highly disfavored by long-standing state and federal precedent: (1) the remaining constitutional applications are too few and create a "freakish" regime contrary to legislative intent; (2) relatedly, the death penalty could not be constitutionally applied to the elderly or the terminally ill; and (3) there are administrative problems.

(1) The Remaining Applications

Both the federal and state constitutions require that the states "genuinely narrow the class of persons eligible for the death penalty" and "reasonably justify the imposition of a more severe sentence" on those made death-eligible "compared to others found guilty of murder" (*Zant v Stephens*, 462 US 862, 877 [1983]; *see also People v Harris*, 98 NY2d 452, 476-477 [2002]; *Matter of Hynes v Tomei*, 92 NY2d 613, 628 [1998]). Accordingly, the Legislature in Penal Law § 125.27 limited death-eligible, first-degree murder to those who kill intentionally, and whose conduct includes at least one of 13 separately listed aggravating factors (Penal Law § 125.27 [1] [a] [i]-[xiii]).

As a result of our decision in *LaValle*, however, only a subcategory of death-eligible defendants—those who will never be released from prison even if the jury deadlocks on the sentence of death or life without parole—would be at risk of the

---

**3.** There is a recognized exception to the general rule where the facial challenge is based on constitutional free-speech grounds. The "overbreadth" doctrine may render a statute invalid in all of its applications (i.e., facially invalid) if invalid in any of them so as not to forestall or "chill" constitutionally protected expression (*see Broadrick v Oklahoma*, 413 US 601, 610-613 [1973]; *see also People v Barton*, 8 NY3d 70, 75-76 [2006] [discussing test for First Amendment overbreadth review]). This is not an overbreadth case.

death penalty. This is because only these first-degree murderers would be immune to the coercive effect of the deadlock instruction. This subcategory, however, embraces the "worst of the worst"; specifically, first-degree murderers who have killed multiple victims and/or have committed other separate and distinct crimes such that they are eligible for consecutive sentences so lengthy in total as to be the functional equivalent of life without parole (the case here); and first-degree murderers whose separate and distinct additional crimes are so severe that the Legislature has prescribed an automatic sentence of life without parole.

For example, a person serving a life sentence who kills a correction officer will have no possibility of parole, regardless of whether the jury deadlocks, for two reasons: he is already serving life without parole on the prior conviction, and the killing of a correction officer constitutes not only first-degree murder but also "aggravated murder" (Penal Law § 125.26 [1] [a] [iii]), which automatically results in a sentence of life without parole (Penal Law § 70.00 [3] [a] [i]; §§ 60.06, 70.00 [5]).[4] The killing of a police officer or a peace officer is also aggravated murder (Penal Law § 125.26 [1] [a] [i], [ii]). Additionally, the Legislature has mandated a sentence of life without parole for someone, 18 years of age or older, who intentionally murders a child under the age of 14 during the course of certain sex crimes (*see* L 2004, ch 459 ["Joan's Law"]; *see also* Penal Law § 125.25 [5]; §§ 60.06, 70.00 [5]); and the crimes of terrorism where the underlying offense is a class A-I felony, or when there is possession of a chemical or biological weapon in the first degree, or use of a chemical or biological weapon in the first degree (*see* L 2004, ch 1 [creating the State Office of Homeland Security and enacting various anti-terrorism measures]; *see also* Penal Law § 490.25 [1], [2] [c], [d]; §§ 490.45, 490.55, 60.06, 70.00 [5]).

In the case of a mandatory life-without-parole crime, the trial judge would inform the jury that he was required to sentence the defendant to life without parole notwithstanding any deadlock on a count of first-degree murder. We specifically stated in *LaValle* that "[i]f the deadlock sentence had been life without parole, then jurors would have no reason to fear that a deadlock would result in the eventual release of the defendant. In that

---

4. The "Crimes Against Police Act" established the new crime of aggravated murder (*see* L 2005, ch 765; *see also* Senate Mem in Support, 2005 McKinney's Session Laws of NY, at 2575).

instance jurors committed to life without parole would not be coerced into giving up their conscientious belief in order to reach a verdict" (3 NY3d at 126 n 19).

Further, the Legislature first amended sections 60.06 and 70.00 (5) of the Penal Law in relation to sentencing for mandatory life-without-parole crimes in July 2004, about a month *after* our decision in *LaValle*. The Legislature included within these provisions the admonition that "nothing in this section" (Penal Law § 60.06) or "subdivision" (Penal Law § 70.00 [5]) respectively "shall preclude or prevent a sentence of death when the defendant is also convicted of murder in the first degree as defined in section 125.27 of this chapter." Sections 60.06 and 70.00 (5) have been amended twice since to add new crimes.

Defendant argues that the deadlock instruction is nonetheless facially unconstitutional because its constitutional applications post-*LaValle* are too few. This is, of course, a curious position to take since the federal and state constitutions affirmatively *require* limiting death eligibility. As a result, the key consideration is not how many constitutional applications of the death penalty remain after our decision in *LaValle*, but whether those remaining applications are rational. A death penalty applicable to first-degree murderers who kill multiple victims and/or commit multiple crimes; or whose crimes include killing a police officer, peace officer or correction officer; or killing a child during a sex crime; or killing in the course of terrorist-related activities surely meets the test of rationality. Certainly, if the Legislature had purposely confined the death penalty to these applications when it adopted the statute in 1995, its decision would not have been amenable to judicial second-guessing on the basis that too few crimes or murderers were covered (*see Harris*, 98 NY2d at 476-477).

Defendant also contends, though, that the deadlock instruction is facially unconstitutional precisely because it allows for far fewer constitutional applications than originally envisioned by the Legislature. Defendant surmises that the Legislature would have preferred no death penalty at all to the "freakish" regime left after *LaValle*. Similarly, the concurrence opines that "any attempt to save a remnant of the death penalty statute through an exercise in 'application severability' would be a mistake" (concurring op at 157).

The death penalty statute was adopted by the Legislature in 1995 after almost two decades of public debate and political re-

action (*see* Sack, *Political Budget Gap is Widening*, New York Times, Mar. 9, 1995; Dao, *New York Leaders Offer Limited Bill on Death Penalty*, New York Times, Mar. 4, 1995). The death penalty was then, as now, controversial. Every aspect of this new legislation was clearly going to be litigated, with unpredictable results. The deadlock instruction itself is a perfect example. As the legislative debate set out in *LaValle* illustrates, at least one apparent motivation for including an anticipatory instruction on the consequences of deadlock was to avoid a potential "constitutional problem" (*LaValle*, 3 NY3d at 121). The United States Supreme Court did not decide *Jones* until four years later, in 1999; we did not decide *LaValle* until 2004. And, as previously discussed, the judicial outcomes differed.

In light of its past difficulties in enacting a death penalty and the uncertainties going forward, the Legislature included a severability provision in the statute (*see* L 1995, ch 1, § 37). By so doing, the Legislature told us in the clearest way possible that it preferred a judicially redesigned or "rewritten" statute with fewer applications to a nonexistent one. Allowing the death penalty to be applied to a core group of defendants charged with the worst crimes does not undermine legislative intent; it preserves the legislative will by restricting the death penalty's application in a rational and constitutional manner.

The concurrence protests, however, that "a sensible Legislature" anticipating the *LaValle* decision would not have enacted a statute this limited, which does not "bear[ ] a reasonable resemblance to the statute the Legislature did enact" (concurring op at 158). This amounts to pure judicial guesswork, as it finds no support whatsoever in the statute's text, structure, purpose or history—and the concurrence does not bother to claim otherwise. Professions of deference to the Legislature and judicial modesty ring hollow if a reviewing court is unwilling to uphold as much of a statute as possible, especially where the conventional sources for statutory interpretation (here, text and legislative history) clearly signal in this direction.[5] Of course, the Legislature may always amend the death penalty statute in

---

**5.** Our decision in *Association of Surrogates & Supreme Ct. Reporters Within City of N.Y. v State of New York* (79 NY2d 39 [1992]) does not support the proposition that application severability is unavailable in the circumstances presented in this case (plurality op at 155; concurring op at 157). In *Surrogates*, the Legislature adopted a statute intended to offset anticipated state budgetary shortfalls for fiscal year 1991-1992 by imposing a five-day lag payroll upon both represented and unrepresented employees of the Unified Court System. We concluded that this legislation unconstitutionally impaired the

any number of ways, as the concurrence observes. The whole point of severability doctrine, however, is to salvage as much of the Legislature's handiwork as possible, and to free the Legislature from the burden of reenacting that which has already once successfully run the lawmaking gauntlet. There can be no doubt that the Legislature intended to make the death penalty enforceable against someone like defendant, who has been convicted of multiple counts of first-degree murder.

(2) The Elderly and the Terminally Ill

Defendant hypothesizes a 70-year-old or terminally ill defendant who is convicted of only one count of capital murder. A minimum sentence of 20 to 25 years to life would exceed this defendant's life expectancy, but state and federal proscriptions against cruel and unusual punishment would bar imposition of the death penalty. Accordingly, defendant argues that the deadlock instruction, even if not unconstitutionally coercive in some applications, is still facially unconstitutional because it violates the Eighth Amendment.

Of course, senior citizens do not swell the ranks of first-degree murderers in New York. According to defendant, out of 560 first-degree murder prosecutions in New York from September 5, 1995 through November 14, 2005, only one involved a 70 year old. There are no comparable figures for the terminally ill, but it is probably safe to surmise that few of these 560 prosecutions involved defendants known to be near death. Assuming a prosecutor in the future is foolhardy enough to seek the death penalty against an elderly or terminally ill defendant on one count of capital murder, and assuming that a jury imposes the death sentence, after hearing mitigating evidence that would presumably dwell on the defendant's age and health, the death

---

represented employees' employment contracts. We noted that application severance would preserve the statute's purpose—which was to generate a specified level of budgetary savings—"[i]n a general way" because unrepresented employees, who made up 10% of the employees covered by the statute, would remain subject to it (79 NY2d at 48). We decided, however, that application severability was not available for two reasons. First, we stated that "[s]ignificantly" there was no severability clause in the statute (*id.*). Then we turned to legislative history, noting that the Legislature had "enacted lag payrolls on two prior occasions in the recent past and in neither of them did it apply the legislation to only a limited segment of the employee pool, or provide for severability if the statute was invalid as to some of those affected" (*id.*). In sum, in *Surrogates* we looked first to see whether there was any suggestion in the text that the Legislature preferred severability; finding none, we examined other indicia of legislative intent. The difference between this case and *Surrogates* is that, applying the same rules, the facts point in opposite directions.

sentence would never survive Eighth Amendment review, or examination for proportionality under CPL 470.30 (3) (b) (Court of Appeals mandated to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant"). In short, the notion that the deadlock instruction infringes the constitutional rights of the elderly and the terminally ill is beyond farfetched; it is a chimera. Even in First Amendment overbreadth review, where the party mounting a facial challenge need not demonstrate "wholesale constitutional impairment," the courts look at whether the hypothesized constitutional infirmity is something more than insubstantial (*see Barton*, 8 NY3d at 75-76 ["The test for determining overbreadth is whether the law on its face prohibits a real and substantial amount of constitutionally protected conduct. (T)he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge" (internal quotation marks and citations omitted)]; *see also People v Broadie*, 37 NY2d 100, 119 [1975] [upholding Rockefeller Drug Laws, which were challenged on Eighth Amendment grounds, as facially constitutional although "in some rare case on its particular facts" it may be found "that the statutes have been unconstitutionally applied"]).

(3) Administrative Problems

Defendant also catalogs a "host of difficult questions of administration" that would supposedly cripple enforcement of the death penalty in those cases where the deadlock instruction could be constitutionally applied. These range from the fanciful (the prospect of genetic testing to assess whether a defendant suffered, or was at risk, for a terminal illness) to mundane questions of timing. In its sole comment on the merits in this appeal, the plurality echoes this complaint, worrying that the trial court would be compelled to act without the benefit of a presentencing report in violation of CPL 380.30 and 390.20; and that the "new framework" would be "repugnant to the Legislature's intent as the court would have to conduct some sort of actuarial analysis and health assessment to determine defendant's expected longevity as well as a thorough examination of the existence of convictions that may require consecutive sentencing" (plurality op at 154-155).

As the People point out, these concerns do not pose insurmountable practical problems; they are largely matters of scheduling. For example, a presentencing report may be ordered

immediately after the jury hands down a guilty verdict and before the penalty-phase trial even begins; a trial judge should thoroughly examine the existence of convictions that may require consecutive sentencing in every case (*see* Penal Law § 70.25).

Further, a defendant-specific "actuarial analysis" is not required—the trial court did not need to conduct one in this case. The issue boils down to whether a defendant is subject to consecutive sentences so lengthy in relation to life expectancy in the United States that no rational juror could harbor a reasonable belief that the defendant would ever be released from prison even if the jury deadlocked on the sentence of death or life without parole;[6] or an actual sentence of life without parole is otherwise mandated.

The former standard was easily met in three of the six capital appeals considered by the Court, where the defendant was eligible for consecutive sentencing totaling in excess of 100 years.[7] It eliminates the theoretical risk that an aged or frail defendant could be executed while "a 20 year old who committed the exact same crimes could not be" (concurring op at 159). The concurrence evidently does not consider such an approach to be a satisfactory or permissible limiting principle for constraining the statute. I disagree for reasons already explained. But even if I were to agree, the concurrence nowhere explains why the deadlock instruction is facially unconstitutional even though it

---

**6.** Life expectancy tables, sourced from the National Center for Health Statistics, are so commonly used in the courts that they are included in the Pattern Jury Instructions (*see* 1B NY PJI3d Appendix A [2007]). The most recent edition of the PJI includes life tables for the United States based on age-specific death rates in 1997, which were published in 1999. These tables project life expectancy for males born in 1997 at 73.6 years, and life expectancy for females born in 1997 at 79.4 years (*see id.* at 1632, 1635). A defendant would necessarily be at least 18 years old and born earlier than whatever birth year is specified in the life expectancy tables in the PJI, because they are updated periodically. Accordingly, the deadlock charge is unquestionably (and comfortably) noncoercive whenever a defendant, regardless of youth or age or health status, is eligible for consecutive sentences exceeding these widely accepted life expectancy numbers for males and females.

**7.** The three are the defendants in this case, *People v Mateo* (2 NY3d 383 [2004]) and *Harris*. In addition, because the defendant in *People v Shulman* (6 NY3d 1 [2005]) was a serial killer, the People might have charged his crimes differently to run up the potential consecutive sentencing had they known this to be necessary to insure a noncoercive deadlock instruction. The defendants in *LaValle* and *People v Cahill* (2 NY3d 14 [2003]) were single-victim first-degree murderers. A noncoercive deadlock charge was not possible in these two cases in light of the *LaValle* analysis.

may be constitutionally applied to a first-degree murderer who also stands convicted of a mandatory life-without-parole crime. Neither does the plurality. This aspect of today's decision contradicts and frustrates the Legislature's manifest intention when it amended sections 60.06 and 70.00 (5) of the Penal Law post-*LaValle*.

## IV.

## Conclusion

The crime in this case was horrific: apparently to eliminate the witnesses to a robbery, seven human beings were shot in the head at point-blank range; five of them died. After a textbook trial, defendant was convicted of six counts of capital murder and sentenced to death by the jury. Yet, a majority of the Court vacates the sentence of death. Why? Not because the deadlock instruction delivered by the trial judge was coercive—it was not, as the concurrence concedes and the plurality does not dispute. Instead, John Taylor's death sentence is vacated because the deadlock instruction delivered in the capital trial of Stephen La-Valle was coercive.

It is, to say the least, highly unusual for us to declare a statute facially unconstitutional so that its constitutional applications fall by the wayside along with its unconstitutional ones. It is unheard of for us to do such a thing without explanation. The plurality points to our "holding" in *LaValle* that "the death penalty sentencing statute is unconstitutional on its face" (plurality op at 155). The careful reader, however, will not discover those words among the *LaValle* opinion's several self-styled "holdings"; the careful reader will not encounter any discussion of facial constitutionality or explanation why the deadlock instruction's constitutional and unconstitutional applications are not severable. Certainly, "death is qualitatively different and thus subject to a heightened standard of reliability" (*LaValle*, 3 NY3d at 127). But this does not mean that "because of the unique severity and finality of a sentence of death, a defendant must be given every possible opportunity to escape from it" (*id.* at 148-149 [R.S. Smith, J., dissenting]). It does not release an appellate court from the fundamental obligation to furnish the parties and the public with a reasoned explanation for its decision. I respectfully dissent.

Chief Judge KAYE and Judge JONES concur with Judge CIPAR-ICK; Judge SMITH concurs in result in a separate opinion; Judge READ dissents in another opinion in which Judges GRAFFEO and PIGOTT concur.

Judgment modified, etc.