******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., concurring. I join the majority's decision not to disturb *State* v. *Santiago*, 318 Conn. 1, 9, 122 A.3d 1 (2015),[1] which held that, "in light of the governing constitutional principles and Connecticut's unique historical and legal landscape . . . following its prospective abolition, this state's death penalty no longer comports with contemporary standards of decency and no longer serves any legitimate penological purpose. For these reasons, execution of those offenders who committed capital felonies prior to April 25, 2012, would violate the state constitutional prohibition against cruel and unusual punishment." My decision to join the majority's decision to reverse the death sentence of the defendant, Russell Peeler, is significantly informed by the unique position that I hold as the only active member of this court who did not sit to decide *Santiago*, which was a four to three decision. In my view, stare decisis considerations of this court's institutional legitimacy and stability are at their zenith in this particular case, given that the *only* thing that has changed since this court decided *Santiago* is the composition of this court.[2] Having considered *Santiago* in light of the arguments raised by the parties in this appeal, I conclude that it is not so clearly wrong that we should risk damaging this court's institutional stability by overruling it. Put differently, because it would imperil our state's commitment to the rule of law for it to appear that a change in the composition of the court resulted in the immediate retraction of a landmark state constitutional pronouncement, I join in the court's decision to uphold *Santiago*.

The background legal principles governing the doctrine of stare decisis are well established. "The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 519, 949 A.2d 1092 (2008). "This court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law. . . . Stare decisis is a formidable obstacle to any court seeking to change its own law. . . . It is the most important application of a theory of [decision-making] consistency in our legal culture and it is an obvious manifestation of the notion that [decision-making] consistency itself has normative value. . . . Stare decisis does more than merely push courts in hard cases, where they are not convinced about what justice requires, toward decisions that conform with decisions made by previous courts. . . . The doctrine is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves

resources and it promotes judicial efficiency. . . .

"As this court has stated many times, [t]he true doctrine of stare decisis is compatible with the function of the courts. . . . [T]here is no question but that [a] decision of this court is a controlling precedent until overruled or qualified. . . . [S]tare decisis . . . serve[s] the cause of stability and certainty in the law—a condition indispensable to any well-ordered system of jurisprudence . . . .

"Whether stare decisis serves the interests of judicial efficiency, protection of expectations, maintenance of the rule of law, or preservation of judicial legitimacy, however, is not dispositive. The value of adhering to precedent is not an end in and of itself, however, if the precedent reflects substantive injustice. Consistency must also serve a justice related end. . . . When *a prior decision is seen so clearly as error* that its enforcement [is] for that very reason doomed . . . the court should seriously consider whether the goals of stare decisis are outweighed, rather than dictated, by the prudential and pragmatic considerations that inform the doctrine to enforce a clearly erroneous decision. Stare decisis is not an inexorable command. . . . The court must weigh [the] benefits [of stare decisis] against its burdens in deciding whether to overturn a precedent it thinks is unjust. The rule of stare decisis may entail the sacrifice of justice to the parties in individual cases, but, far from being immune from considerations of justice, it must always be tested against the ends of justice more generally. . . .

"Indeed, this court has long believed that although [s]tare decisis is a doctrine developed by courts to accomplish the requisite element of stability in court-made law, [it] is not an absolute impediment to change. . . . [S]tability should not be confused with perpetuity. If law is to have a current relevance, courts must have and exert the capacity to change a rule of law when reason so requires. . . . [I]t is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations. Those doctrines only will eventually stand which bear the strictest examination and the test of experience. . . . The United States Supreme Court has said that when it has become convinced of former error, it has never felt constrained to follow precedent. . . .

"[One] well recognized exception to stare decisis under which a court will examine and overrule a prior decision . . . [is when that prior decision] is *clearly wrong*. . . . The doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and harmful before it is abandoned. . . . Because stare decisis is not a rule of law but a matter of judicial policy . . . it does not have the same kind of force in each kind of case so that adherence to or deviation from that general policy *may depend upon the kind of case*

*involved, especially the nature of the decision to be rendered that may follow from the overruling of a precedent.*" (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 658–61, 680 A.2d 242 (1996). "In short, consistency must not be the only reason for deciding a case in a particular way, if to do so would be unjust. Consistency obtains its value best when it promotes a just decision." Id., 662.

Guided by these general principles, I first observe that the timing of our consideration of the present case renders stare decisis considerations particularly strong with respect to the public's perception of this court's legitimacy in its exercise of its core function of constitutional interpretation. See *State* v. *Ferguson*, 260 Conn. 339, 367, 796 A.2d 1118 (2002) ("[w]e will not revisit the same issues we so recently have decided"). In contrast to other cases, wherein the passage of time has yielded factual or legal developments that serve as a basis for a challenge to the decision under attack; see, e.g., *Campos* v. *Coleman*, 319 Conn. 36, 37–38, 123 A.3d 854 (2015) (overruling *Mendillo* v. *Board of Education*, 246 Conn. 456, 495–96, 717 A.2d 1177 [1998], and recognizing derivative cause of action for loss of parental consortium by minor child); *State* v. *Salamon*, supra, 287 Conn. 522–28 (interpretation of kidnapping statutes); all that has changed since *Santiago* was decided "is the composition of this [c]ourt, which is not a valid reason for ignoring stare decisis principles." *Haynes* v. *State*, 273 S.W.3d 183, 187 (Tex. Crim. App. 2008), overruled on other grounds by *Bowen* v. *State*, 374 S.W.3d 427 (Tex. Crim. App. 2012); see also *Wheatfall* v. *State*, 882 S.W.2d 829, 843 (Tex. Crim. App. 1994) (The court rejected the argument that it "should consider the changing membership of the [United States] Supreme Court in our review of their precedent" because "this [c]ourt would be forced to reconsider every decision of the [United States] Supreme Court or our [c]ourt upon changes in membership. Such an endeavor would defeat one of the essential purposes of stare decisis."), cert. denied, 513 U.S. 1086, 115 S. Ct. 742, 130 L. Ed. 2d 644 (1995). Indeed, as this court observed more than seventy years ago, "a change in the personnel of the court affords no ground for reopening a question which has been authoritatively settled." *Tileston* v. *Ullman*, 129 Conn. 84, 86, 26 A.2d 582 (1942), appeal dismissed, 318 U.S. 44, 63 S. Ct. 493, 87 L. Ed. 603 (1943); accord *Herald Publishing Co.* v. *Bill*, 142 Conn. 53, 62, 111 A.2d 4 (1955) ("[a] change in the personnel of the court never furnishes reason to reopen a question of statutory interpretation").

The New York Court of Appeals has described the benefits of decisional stability in the face of the changing composition of the court, aptly stating that it "would have been scandalous for a court to shift within less than two years because of the replacement of one of the

majority in the old court by one who now intellectually would have preferred to have voted with the old minority and the new one. The ultimate principle is that a court is an institution and not merely a collection of individuals; just as a higher court commands superiority over a lower not because it is wiser or better but because it is institutionally higher. This is what is meant, in part, as the rule of law and not of men." *People* v. *Hobson*, 39 N.Y.2d 479, 491, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976); see also *People* v. *Taylor*, 9 N.Y.3d 129, 148, 878 N.E.2d 969, 848 N.Y.S.2d 554 (2007) ("Stare decisis is deeply rooted in the precept that we are bound by a rule of law—not the personalities that interpret the law. Thus, the closeness of a vote bears no weight as to a holding's precedential value as a controversy settled by a decision in which a majority concur should not be renewed without sound reasons . . . ." [Citation omitted; internal quotation marks omitted.]); S. Wachtler, "Stare Decisis and a Changing New York Court of Appeals," 59 St. John's L. Rev. 445, 455–56 (1985) (describing "necessary balance between stability and innovation," and stating that "[j]udiciously applied in a proper case, the doctrine of stare decisis will allay the fears of those who look with apprehension upon the ongoing personnel changes in the [New York] Court of Appeals").

Put differently, for me to join this court and near immediately disturb this court's so recently decided landmark decision in *Santiago* would require me, in the words of Justice Thurgood Marshall, to embrace the principle that "[p]ower, not reason, is the new currency of this [c]ourt's decisionmaking." *Payne* v. *Tennessee*, 501 U.S. 808, 844, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) (Marshall, J., dissenting); see id. (Justice Marshall dissented from the court's decision to overrule *Booth* v. *Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 [1987], and *South Carolina* v. *Gathers*, 490 U.S. 805, 109 S. Ct. 2207, 104 L. Ed. 2d 876 [1989], and to permit the admission of victim impact evidence during the penalty phases of capital trials because "[n]either the law nor the facts supporting *Booth* and *Gathers* underwent any change in the last four years. Only the personnel of this [c]ourt did."). I agree with Justice Marshall that "stare decisis is important not merely because individuals rely on precedent to structure their commercial activity but because fidelity to precedent is part and parcel of a conception of the judiciary as a source of impersonal and reasoned judgments. . . . Indeed, this function of stare decisis is in many respects even more critical in adjudication involving constitutional liberties than in adjudication involving commercial entitlements. Because enforcement of the [federal] [b]ill of [r]ights and the [f]ourteenth [a]mendment [to the United States constitution] frequently requires this [c]ourt to rein in the forces of democratic politics, this [c]ourt can legitimately lay

claim to compliance with its directives only if the public understands the [c]ourt to be implementing principles . . . founded in the law rather than in the proclivities of individuals." (Citation omitted; emphasis omitted internal quotation marks omitted.) *Payne* v. *Tennessee*, supra, 852–53 (Marshall, J., dissenting).[3]

My sensitivity to stare decisis in this case is heightened by the fact that we are called on to reconsider the court's conclusion in *Santiago* that the death penalty is now unconstitutional under our state's constitution. "[I]f the doctrine of stare decisis has any efficacy under our case law, death penalty jurisprudence cries out for its application. Destabilizing the law in these cases has overwhelming consequences . . . ." *Zakrzewski* v. *State*, 717 So. 2d 488, 496 n.5 (Fla. 1998) (Anstead, J., concurring), cert. denied, 525 U.S. 1126, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); accord *State* v. *Waine*, 444 Md. 692, 702, 122 A.3d 294 (2015) (observing that "[w]here the [c]ourt has previously recognized a new [s]tate constitutional standard as fundamental to due process, deference to that precedent ensures the constancy upon which due process endures"). Indeed, in *People* v. *Taylor*, supra, 9 N.Y.3d 129, Judge Robert S. Smith of the New York Court of Appeals explained in his concurring opinion his decision to join the majority in overturning a death sentence obtained under an unconstitutional death penalty procedure statute— despite dissenting three years before in *People* v. *LaValle*, 3 N.Y.3d 88, 99, 817 N.E.2d 341, 783 N.Y.S.2d 485 (2004), in which the court had invalidated that statute.[4] Judge Smith explained that the "policies underlying the doctrine of stare decisis, which include stability, predictability, respect for our predecessors and the preservation of public confidence in the courts, are at their strongest where, as here, a court is asked to change its mind although nothing else of significance has changed. No one suggests that any development in the last three years, either in the law or the law's effect on the community, has changed the context in which *LaValle* was decided. *Indeed, we are asked to revive the very same statute held invalid in LaValle—not a theoretically impossible step, but a radical one. So far as I can tell, we have never done such a thing, and the occasions on which other courts have done it are rare* . . . ." (Citation omitted; emphasis added.) *People* v. *Taylor*, supra, 156.

Guided by these authorities, I am not convinced that any analytical shortcomings in *Santiago* surpass the significant stare decisis concerns that would accompany overruling that landmark decision. See, e.g., *Dickerson* v. *United States*, 530 U.S. 428, 443, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) ("[w]hether or not we would agree with [the] reasoning [of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] and its resulting rule, were we addressing the issue in the first instance, the principles of stare decisis

weigh heavily against overruling it now"). Specifically, I have reviewed the opinions and briefs filed in *Santiago*, and determined that the majority in that case did not unreasonably read the record and the authorities when it concluded that: (1) the issues decided therein were raised by the parties, thus affording the state notice and an opportunity to brief them, had it elected to do so; and (2) the death penalty now is cruel and unusual punishment under our state's constitution in the wake of the death penalty's prospective repeal in No. 12-5 of the 2012 Public Acts. Although reasonable jurists certainly could—and most emphatically did—disagree about the merits of *Santiago*, I do not view the majority's decision in that case as so fundamentally flawed that it warrants overruling so soon after it was decided.[5]

Thus, I emphasize my disagreement with the state's argument, in its supplemental brief and at oral argument before this court, that the recency of the court's decision in *Santiago* renders it an appropriate candidate for overruling, insofar as there has been minimal reliance on it to this point, and that the doctrine "carries less force when the court is asked to reconsider constitutional rulings because, unlike in statutory interpretation cases, the legislature lacks the ability to correct a judicial mistake." See, e.g., *State* v. *Salamon*, supra, 287 Conn. 523 ("[p]ersons who engage in criminal misconduct, like persons who engage in tortious conduct, rarely if at all will . . . give thought to the question of what law would be applied to govern their conduct if they were to be apprehended for their violations" [internal quotation marks omitted]); *Conway* v. *Wilton*, supra, 238 Conn. 661 (force of stare decisis is "least compelling [when the ruling revisited] may not be reasonably supposed to have determined conduct of the litigants" [internal quotation marks omitted]). I agree with Justice Palmer's observation in his opinion in the present case that the watershed nature of this court's decision in *Santiago* creates, in essence, a different kind of reliance concern beyond the arithmetically measurable reliance considered at oral argument before this court and emphasized by Justice Zarella in his dissenting opinion.[6] See L. Powe, "Intragenerational Constitutional Overruling," 89 Notre Dame L. Rev. 2093, 2104 (2014) (concluding that "reliance is rarely a factor in any decision about stare decisis in a case that does not involve economics" but observing that "[p]erhaps reliance in the noneconomic sphere internalizes . . . the [c]ourt's view of the likely public reaction to a formal overruling"). That reliance concern is particularly heightened in the death penalty context, insofar as I can imagine nothing that would appear more shockingly arbitrary than for this court to invalidate the death penalty in *Santiago* and render a final judgment sparing the defendant in that case,[7] and then—with the substitution of a newly appointed justice—immediately over-

rule *Santiago* and hold that the defendant and his counterparts on death row could potentially face execution.[8] Putting aside the obvious equal protection consequences highlighted by Justice Palmer, this result, as demonstrated by very recent experience in one of our sister states, would at the very least strongly *appear* to stem solely from when the filing and scheduling of the defendants' appeals and the composition of the panels that heard their cases.[9] See *State* v. *Petersen-Beard*, Docket No. 108061, 2016 WL 1612851, *1 (Kan. April 22, 2016) (four to three decision overruling three separate four to three decisions issued by differently constituted panel on same day). This would be the nadir of the rule of law in the state of Connecticut.[10] Put differently, I find no substantive or procedural errors in *Santiago* whose magnitude justifies incurring the massive risk to our court's credibility as an institution that the state asks us to undertake.

Accordingly, I join in the judgment of the court.

[1] Unless otherwise noted, all references to *Santiago* in this opinion refer to *State* v. *Santiago*, supra, 318 Conn. 1.

[2] I wish to explain my position that this court properly considered this constitutional issue, namely, the constitutionality of the death penalty in the wake of No. 12-5 of the 2012 Public Acts, in the first instance in *Santiago*, notwithstanding the fact that it was published well after I joined the court and its panel ultimately included a recently retired justice. In particular, I emphasize that I do not view the court's actions in *Santiago* as in any way precluding me from exercising my duty to decide this significant issue as a matter of first impression.

I recognize that some concerns have been expressed about this court's decision to consider the constitutionality of the death penalty in the wake of Public Act 12-5 in the first instance in *Santiago*, rather than in this case, given this court's policy and practice of deciding important constitutional issues with a full and current panel of this court whenever possible. See W. Horton, "One Thought on *State* v. *Santiago*," Horton, Shields & Knox Appellate Blog (October 28, 2015), available at http://hortonshieldsknox. com/one-thought-on-state-v-santiago (last visited May 16, 2016) ("it looks bad for a court when, notwithstanding a constitutional provision that a justice must stop holding office at age [seventy], a newly appointed justice has to sit on the sidelines for months, and in this one case years, while a justice over age [seventy] decides very important cases with which the new justice may disagree"); see also D. Klau, "Supreme Court to Rehear Arguments in Death Penalty Case," Appealingly Brief (December 1, 2015), available at http://appealinglybrief.com/2015/12/01/supreme-court-to-rehear-arguments-in-death-penalty-case (last visited May 16, 2016) (describing court's position vis-à-vis *Santiago* and present case as "uncomfortable").

By way of background, I note that Governor Dannel P. Malloy appointed me to this court in December, 2013, to the seat on this court vacated by the mandated retirement of Justice Flemming L. Norcott, Jr. The constitutionality of the death penalty in the wake of Public Act 12-5 was argued in *Santiago* on April 23, 2013, approximately six months prior to Justice Norcott attaining the constitutionally mandated age of retirement. Justice Norcott then continued to participate in deliberations as a member of that panel, including consideration of the state's subsequent motions for reconsideration and to stay, in accordance with General Statutes § 51-198 (c). Justice Norcott's vote to join the slender majority in *Santiago* ended a career on this court in which he had been a leading voice against the constitutionality of the death penalty. See, e.g., *State* v. *Santiago*, 305 Conn. 101, 307 n.166, 49 A.3d 566 (2012); *State* v. *Breton*, 264 Conn. 327, 446–47, 824 A.2d 778 (2003) (*Norcott, J.*, dissenting).

I respectfully disagree with the concerns expressed about Justice Norcott's continued participation in *Santiago*, to my apparent exclusion from the opportunity to decide this issue tabula rasa. In my view, Justice Norcott's continued deliberation in *Santiago* pursuant to § 51-198 (c) was wholly proper and appropriate under the letter and purpose of that statute, despite

the fact that his participation lasted for nearly two years following my elevation to what had been his seat on this court. To allow prudential concerns about the exclusion of a newly appointed justice to disenfranchise Justice Norcott from his continued participation in *Santiago* nearly eight months into deliberations on that case—particularly given the magnitude of the issues considered therein—would have raised the constitutionally unsavory specter of running out a football game clock on the office of a member of this court in a case argued well before his retirement and the appointment of his successor. See *Honulik* v. *Greenwich*, 293 Conn. 641, 661–62, 980 A.2d 845 (2009) (This court upheld the constitutionality of § 51-198 [c] and noted that it relieved a retiring justice from the obligation to "arbitrarily . . . cease hearing new cases at some point prior to reaching seventy, effectively cutting his or her term of office short, and without the possibility of a replacement. If a justice must cease all Supreme Court case work on the date of his seventieth birthday, then, by necessity, he is divested of the full authority and responsibility of his office many months before that date."). This is particularly so, given that the circumstances leading to the lengthy deliberation may well have been completely out of Justice Norcott's control. See id., 662 (noting that some cases result "despite all good faith efforts," in "misjudgment as to the time required to dispose of an appeal or delay due to unforeseen difficulties").

Thus, the timing of my participation in deciding this issue reflects nothing more than the following facts: (1) the constitutionality of the death penalty following the enactment of Public Act 12-5 is an issue of law common to numerous cases on this court's docket; (2) accordingly, some case had to be the first to consider the issue, with *Santiago* being the first ready case in line; (3) the length of the court's deliberations in *Santiago* were consistent with the gravity of the issue before the court and the length of the numerous opinions published in that case; and (4) once this court decided *Santiago*, it became necessary to resolve other death penalty cases as they became ready for consideration, with the present case being the first direct appeal in line after the conclusion of proceedings in *Santiago*.

[3] In dissenting in *Payne*, Justice Marshall described the majority's decision to distinguish the importance of stare decisis in cases "involving property and contract rights, where reliance interests are involved" from those "involving procedural and evidentiary rules," particularly when "decided by the narrowest of margins, over spirited dissents" as creating a "radical new exception to the doctrine of stare decisis," applicable to prior decisions with single vote margins. (Internal quotation marks omitted.) *Payne* v. *Tennessee*, supra, 501 U.S. 845, 851. He observed that "the continued vitality of literally scores of decisions must be understood to depend on nothing more than the proclivities of the individuals who now comprise a majority of this [c]ourt." (Emphasis omitted.) Id., 851. Justice Marshall eloquently stated that "the majority's debilitated conception of stare decisis would destroy the [c]ourt's very capacity to resolve authoritatively the abiding conflicts between those with power and those without. If this [c]ourt shows so little respect for its own precedents, it can hardly expect them to be treated more respectfully by the state actors whom these decisions are supposed to bind. . . . By signaling its willingness to give fresh consideration to any constitutional liberty recognized by a [five to four] vote 'over spirited dissen[t]' . . . the majority invites state actors to renew the very policies deemed unconstitutional in the hope that this [c]ourt may now reverse course, even if it has only recently reaffirmed the constitutional liberty in question." (Citations omitted.) Id., 853–54. In sum, Justice Marshall stated: "Cast aside today are those condemned to face society's ultimate penalty. Tomorrow's victims may be minorities, women, or the indigent. Inevitably, this campaign to resurrect yesterday's 'spirited dissents' will squander the authority and the legitimacy of this [c]ourt as a protector of the powerless." Id., 856.

[4] In *LaValle*, the New York Court of Appeals considered the constitutionality of a statute requiring the trial judge to inform the jury that its deadlock with respect to a sentence of death or life without parole would require the judge to sentence the defendant to a lesser sentence of life imprisonment with parole eligibility after twenty to twenty-five years. *People* v. *LaValle*, supra, 3 N.Y.3d 116. The court held that this statutory instruction was unconstitutionally coercive and that the court had to strike the statute subject to legislative repair because, under the state constitution, "the absence of any instruction is no better than the current instruction under our constitutional analysis," and "[l]ike the flawed deadlock instruction, the absence of an instruction would lead to death sentences that are based on speculation, as the [l]egislature apparently feared when it decided to pre-

scribe the instruction." Id., 128.

[5] In his well researched and scholarly dissenting opinion, Justice Zarella crafts a test intended to mitigate the seemingly subjective nature of the existing stare decisis inquiry by requiring the court to engage in a multifactor balancing analysis after making a threshold determination that the precedent under attack is, for whatever reason, wrongly decided. Justice Zarella's test does not, however, accommodate for degrees of wrong, insofar as he observes that, "[i]n addition to placing too little value on precedent, the wrongness of a previous decision should not factor into the stare decisis calculus because it is difficult to quantify or measure the degree of a particular decision's wrongness," noting that "the merits determination is independent of, and has no impact on, the stare decisis analysis."

I respectfully disagree with Justice Zarella's refusal to consider the relative degree of "wrong" in engaging in his stare decisis analysis. First, with no qualitative control other than the balancing of costs of maintaining versus eliminating a prior decision, it appears to be receptive to overruling precedent in a way that undercuts the salutary features with respect to promoting stability in the law. Second, this approach ironically appears to overrule certain well established principles of stare decisis, namely that: (1) the prior decision must be shown to be "*clearly wrong*" with a "clear showing that an established rule is incorrect and harmful"; (emphasis added; internal quotation marks omitted) *Conway* v. *Wilton*, supra, 238 Conn. 660–61; and (2) "a court should not overrule its earlier decisions unless the *most cogent* reasons and *inescapable logic* require it." (Emphasis added; internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 519.

In my view, the precedential value of an older decision, unquestionably correct when decided, might well erode over time as the result of relevant changes in law and policy, thus rendering a decision to overrule it less of a shock to the stability of the court and the law. See S. Burton, "The Conflict Between Stare Decisis and Overruling in Constitutional Adjudication," 35 Cardozo L. Rev. 1687, 1703–1704 (2014) (describing threshold factors to examine before deciding merits of whether to overrule precedent, including: "[1] notice and predictability; [2] legal developments that make the precedent anomalous; [3] the precedent's workability; [4] reliance on the precedent; [5] the quality of the precedent court's reasoning; and [6] changes in factual circumstances that erode the precedent's justification" [footnotes omitted]). Without the benefit of the lessons learned from watching a precedent's value evolve over time, I would require a far greater showing of error—near akin to that required to justify reconsideration of a decision under Practice Book § 71-5—to justify the overruling of a decision of extremely recent vintage, wherein nothing has changed other than the parties and the composition of the court. In my view, such an overruling would be appropriate only if the original decision evinced a complete misunderstanding of the governing legal principles, particularly if compounded by lack of meaningful adversarial input from the parties to the earlier case. See *State* v. *DeJesus*, 288 Conn. 418, 437 and n.14, 953 A.2d 45 (2008) (considering case law not addressed in *State* v. *Sanseverino*, 287 Conn. 608, 625, 949 A.2d 1156 [2008], and overruling *Sanseverino*, which held, without briefing from parties, that appellate remedy in case when jury was not instructed in accordance with *Salamon* was judgment of acquittal rather than new trial before properly instructed jury); see also *State* v. *Sanseverino*, 291 Conn. 574, 574–75, 969 A.2d 710 (2009) (following *DeJesus* in revised opinion issued after grant of state's motion for reconsideration); *State* v. *Sanseverino*, supra, 287 Conn. 663 (*Zarella*, *J.*, dissenting) (observing that majority decided remedy issue sua sponte with no argument or briefing from parties).

[6] At oral argument before this court, the state and members of the court discussed the concept of reliance by considering hypothetical questions about whether this court could ever overrule its constitutional pronouncement in *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 957 A.2d 407 (2008), namely, that the previous state statutory prohibition against same sex marriage violated the constitution of Connecticut. Notwithstanding the United States Supreme Court's recent decision in *Obergefell* v. *Hodges*,    U.S.    , 135 S. Ct. 2584, 2593, 192 L. Ed. 2d 609 (2015), I recognize that the reliance concerns attendant to *Kerrigan* were numerically greater than those present in this case, insofar as the legislature changed the statutory scheme and thousands of our state's citizens were married in the eight years since this court's decision in *Kerrigan*. Given the life interest at issue here, I suggest that the reliance interests on *Santiago* of the defendant and others presently exposed to the death penalty differ only in kind, and not degree, from those of the couples who were married as a result of *Kerrigan*.

[7] The defendant in *Santiago* has already been resentenced to life imprisonment in accordance with this court's decision in that case. See *State* v. *Santiago*, 319 Conn. 935, 125 A.3d 520 (2015) (denying state's motion for stay of judgment).

[8] Justice Zarella criticizes my position with respect to stare decisis as flawed by the logical fallacy of "post hoc ergo propter hoc, or after this, therefore resulting from it." See Black's Law Dictionary (10th Ed. 2014) (defining "post hoc ergo propter hoc" as "[t]he logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential"). He understands my view to be that, "[b]ecause the present appeal has been decided after a change in the court's membership, the change in the membership caused or was the reason to overturn *Santiago*." I believe Justice Zarella misunderstands my position, which simply is one of correlation, *not* causation. As a theoretical matter, had the *Santiago* panel remained intact, it is theoretically possible that one member of the majority could have defected and voted in this case to overrule *Santiago*. Thus, I agree that, as a purely theoretical matter, the change in panel is merely correlative, rather than causational with respect to the potential overruling of *Santiago*. I, however, do not share Justice Zarella's optimism about the probable collective understanding on the part of those who are asked to accept our court's decisions as a consistent statement of what the law is, with respect to the potential overruling of *Santiago*. Hence, Justice Zarella and I irreconcilably, but respectfully, disagree about the public perception issues that would attend the overruling of *Santiago* so soon after it was decided. See also footnote 9 of this concurring opinion.

To this end, I firmly disagree with Justice Zarella's observation that my position with respect to stare decisis in the present case amounts to a "suggestion that this court is bound, now and forever, to follow any decision, right or wrong, unless the panel that decided the previous case is identical to the panel that wishes to overrule that case." I do not believe any such thing, and to take such a position, would, as Justice Zarella observes, stand in contrast to the historical record. Indeed, as a practical matter, such a position would immobilize our case law and render it completely unable to adapt to changes in law and society. My prudential concerns with respect to the panel change and public perception concern the posture of this particular case, which is unique with respect to the juxtaposition of the controversy of the issue and the timing of the argument and decision.

[9] A very recent series of decisions in one of our sister states tells a cautionary tale about the perception of instability created by the rapid overruling of decisions upon the change of a state Supreme Court's membership. In *Doe* v. *Thompson*, Docket No. 110318, 2016 WL 1612872, *23–26 (Kan. April 22, 2016), and two companion cases, *State* v. *Redmond*, Docket No. 110280, 2016 WL 1612917, *5 (Kan. April 22, 2016), and *State* v. *Buser*, Docket No. 105982, 2016 WL 1612846, *7 (Kan. April 22, 2016), the Kansas Supreme Court concluded, in four to three decisions, that certain 2011 amendments to that state's sex offender registration act—such as extension of registration periods, special notations on driver's licenses, and increased "active" availability of registrant information online—were punitive, rather than regulatory, in nature; this rendered their retroactive application to previously convicted sex offenders a violation of the ex post facto clause set forth in article one, § 10, of the United States constitution. One of the four jurists comprising the majority in those cases was a trial court judge who was temporarily assigned to hear cases because of a vacancy on the court created when one of the justices was appointed to a seat on the United States Court of Appeals for the Tenth Circuit. See *Doe* v. *Thompson*, supra, *26 n.1; *State* v. *Redmond*, supra, *5 n.1; *State* v. *Buser*, supra, *7 n.1.

A new justice, Caleb Stegall, was subsequently appointed to the vacancy on the Kansas Supreme Court. After hearing argument in *State* v. *Petersen-Beard*, Docket No. 108061, 2016 WL 1612851, *1 (Kan. April 22, 2016), Justice Stegall authored a four to three decision, which was released on the same day as *Doe*, *Redmond*, and *Buser*, and overruled those decisions. Id., *1. The majority opinion in *Petersen-Beard* adopted large portions of the dissenting opinion in *Doe*, and concluded that the 2011 amendments to the sex offender registration act were not punishment and, therefore, could not be held to constitute cruel and unusual punishment under the Kansas constitution or the eighth amendment to the United States constitution. Id., *4–16. As Justice Johnson, the author of the majority opinion in *Doe*, *Redmond*, and *Buser*, explained in his dissent, the court's conclusion in *Petersen-Beard* did not affect the judgments obtained in the prior three cases, notwithstanding a court-ordered delay in publication pending argument and a decision by a

"newly constituted court" in *Petersen-Beard*, the "apparent rationale [of which] was to make the holding in [*Doe*, *Redmond*, and *Buser*] applicable solely to the parties in those cases." Id., *18; see also id. ("Plainly stated, all of those litigants won on appeal, and the [2011] amendments cannot be applied to them. But they had to wait for many months—unnecessarily in my view—to reap the benefits of their respective wins. I find that to be a denial of justice.").

Interestingly, neither the majority nor the dissent in *Petersen-Beard* considered the doctrine of stare decisis, as it affected the Kansas court's obligation to follow its own recent precedents, with respect to that decision. Reaction to the rapid overruling was, however, widely noticed, and primarily attributed to the change in personnel of the Kansas Supreme Court. One scholarly commentator, Professor David Post, described the Kansas Supreme Court's action in *Petersen-Beard*, which required "all other . . . sex offenders in the state with convictions before 2011" to register, while sparing the defendants in *Doe*, *Redmond*, and *Buser*, as "seem[ing] to violate the very fundamental notion, embedded in our idea of 'due process of law,' that like cases are to be treated alike—someone in precisely the same situation . . . will have to register . . . while [the defendants in *Doe*, *Redmond*, and *Buser*] will not." D. Post, "In a Single Day, the Kansas Supreme Court Issues Important Constitutional Opinions—and Overrules Them," Washington Post (April 25, 2016), available at https://www.washingtonpost. com/news/volokh-conspiracy/wp/2016/04/25/in-a-single-day-the-kansas-supreme-court-issues-important-constitutional-opinions-and-overrules-them (last visited May 16, 2016). Discussing the change in the court's personnel, Professor Post describes as "a bit unseemly" the fact that "[t]his strange circumstance seems to have come about because the Kansas court was short-handed." Id.; see also D. Weiss, "Kansas Supreme Court Issues Three Opinions Then Overrules Them on the Same Day," ABA J. (April 25, 2016) ("[t]he reason for the change in stance was a new justice who joined the court, taking the place of a senior district judge who was filling a vacancy"), available at http://www.abajournal.com/news/article/kansas_supreme_ court_issues_three_opinions_then_overrules_them_on_the_same (last visited May 16, 2016); S. Greenfield, "What a Difference a Day Makes, Kansas Edition," Simple Justice: A Criminal Defense Blog (April 26, 2016), available at http://blog.simplejustice.us/2016/04/26/what-a-difference-a-day-makes-kansas-edition (last visited May 16, 2016) (An article observing that *Petersen-Beard* was inconsistent with the doctrine of stare decisis, and stating that the "problem arose because one seat at the Kansas Supreme Court was filled by one [judge in *Doe*, *Redmond*, and *Buser*], and another [judge in *Petersen-Beard*]. The [c]ourt was split, three to three, on the issue, so that last [vote] was the tie breaker."); T. Rizzo, "Sex Offenders Win and Lose in 'Peculiar' Rulings by the Kansas Supreme Court," Kansas City Star (April 22, 2016), available at http://www.kansascity.com/news/local/crime/article 73328242.html (last visited May 16, 2016) (quoting state attorney general's description of decisions as "peculiar" and stating that "[t]he highly unusual circumstance appear[s] to be the result of a one-justice change in the makeup of the court").

Although public reaction should not sway our decisionmaking, I cannot ignore the likelihood, vividly illustrated by the reaction to the Kansas Supreme Court's recent decision in *Petersen-Beard*, that such rapid overruling of a major constitutional precedent would be attributed solely to the change in the court's composition. This indicates to me that overruling *Santiago* would present the risk of shaking our citizens' confidence in our court as an institution, betraying it as a collection of individuals who make seemingly arbitrary decisions. As I stated previously, the majority's analysis in *Santiago* is not so unreasonable or fundamentally flawed as to justify taking that risk in the public's confidence in this court, and the judiciary as a whole.

[10] Thus, I find wholly unpersuasive the state's arguments that *Santiago* "is no obstacle to this court issuing a correct legal decision on the question of whether capital punishment violates the state constitution," and that "the only result in [this case] that could undermine the public faith in the integrity of this court . . . would be an affirmance of *Santiago* . . . based on the principle of stare decisis. If [this] court believes that *Santiago* . . . properly decided that capital punishment violates the Connecticut constitution, then it should so hold. But if a majority of this court believes that *Santiago* . . . is incorrect, justifying affirmation of that breach through a statement that the court believes it tied its own hands would have a deleterious effect . . . on the public's perception of the procedural fairness of the criminal justice

system and diminish public confidence in the rule of law." (Citation omitted; internal quotation marks omitted.) In my view, any concerns in the public's confidence about this court's technical fidelity to the adversarial appellate decision-making process in *Santiago*—a matter on which the majority and dissent in that case disagreed energetically—are drastically outweighed by the public perception of arbitrariness that would result from the defendant in that case, Eduardo Santiago, getting to live, and the defendant in the present case facing the prospect of lethal injection, for no reason beyond the fact that Santiago's case happened to come up first on this court's docket and was heard by a slightly different panel of this court. See footnote 2 of this concurring opinion.

———————————————